Anne P. KOZAR, Administratrix of the
Estate of John P. Kozar, Deceased,
Plaintiff,

v.

The CHESAPEAKE AND OHIO RAIL-
WAY COMPANY, a Virginia
corporation, Defendant.

Civ. A. No. 5925.

United States District Court,
W. D. Michigan, S. D.

Oct. 23, 1970.

Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., Stephen C. Bransdorfer, Grand Rapids, Mich., of counsel, for plaintiff.

Paul O. Strawhecker, Grand Rapids, Mich., local counsel, Robert A. Straub, general trial counsel, Southfield, Mich., for defendant.

FOX, District Judge.

## OMNIBUS OPINION *

This action was brought by Anne P. Kozar, as administratrix of the Estate of

* This opinion deals separately and at length with a number of issues involved in this case. It is expected that some readers will wish to read only those portions of particular interest to them. Because of this, it has been necessary to repeat certain facts. This is necessary to aid understanding for those not reading the entire opinion.

John P. Kozar, against The Chesapeake and Ohio Railway Company, for damages resulting from the February 12, 1968 accident that took John Kozar's life, pursuant to the Federal Employers' Liability Act. 45 U.S.C. § 51 et seq.

The complaint charged that the defendant's wrongful conduct caused John Kozar's death. Accordingly, the plaintiff sought damages for the financial loss suffered by his beneficiaries. Damages were also sought for the injuries that John Kozar endured before his death as the result of the defendant's conduct. Finally, the plaintiff claimed that the railroad's conduct was so wrongful that it was liable for punitive damages.

The answer denied that the railroad's conduct was wrongful or that it had caused John Kozar's death. Instead, it asserted that John Kozar's negligence was the sole cause of his death.

■ The court, pursuant to Rules 1, 42(b) and 83 of the Federal Rules of Civil Procedure, ordered separate trials on the issues of liability and damages. This was done to facilitate the jury's performance of its function and to promote the "expedition and economy" contemplated by Rule 1 and Rule 42(b). Such a separation of issues in a Federal Employers' Liability Act case also avoids any potential prejudice arising from the issue of contributory negligence. This latter, under the statute, is material only to damages, and its consideration, to any extent, when determining liability can substantially endanger the rights of an injured plaintiff. Thus a separation of issues here not only reduces confusion but enhances the likelihood of the just determination, based solely on the merits of the case, demanded by Rule 1.

The issue of liability was presented first and submitted to the jury on written interrogatories from the court, pursuant to Rule 49(b):

UNITED STATES OF AMERICA

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANNE P. KOZAR, Administratrix of
the Estate of John P. Kozar,
Deceased,

 Plaintiff,

v. CIVIL ACTION NO. 5925

THE CHESAPEAKE & OHIO RAILWAY CO.,
 Defendant.

The jury will from the evidence answer the following in writing:

(1) Was the Chesapeake & Ohio Railroad guilty of negligence, in whole or in part, by reason of acts or omissions of any of its officers, agents or employees, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, works, or other equipment?

 Yes _X_ No___

If the answer to question number (1) is "yes," then answer question number (2).

(2) Was such negligence a proximate cause of the injuries and death of John Kozar, and the resulting injuries to his wife, Anne P. Kozar, and their children?

Yes $\times$ No___

/s/ Howard Bruce Connell
Foreman of the Jury

Following the jury's response above, the issue of damages was tried and submitted on two separate sets of interrogatories. The jury was instructed to first consider compensatory damages, striking from their minds any factors relevant only to the punitive damage issue. This done, they were then to proceed to the punitive damage question. The jury followed the court's instructions, and decided as follows:

UNITED STATES OF AMERICA

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ANNE P. KOZAR, Administratrix of
the Estate of John P. Kozar,
Deceased,

 Plaintiff,

v. CIVIL COURT NO. 5925

THE CHESAPEAKE & OHIO RAILWAY CO.,
 Defendant.

COMPENSATORY DAMAGES

COUNTS I and II.

(1) Was John Kozar guilty of negligence?

Yes $\checkmark$ No___

If you answer question number (1) "yes," then answer question number (2).

(2) If John Kozar was guilty of negligence, was this negligence a proximate cause of his injuries?

Yes $\checkmark$ No___

If you answer both question number (1) and question number (2) "yes," then answer question number (3).

(3) What percentage did John Kozar's negligence contribute to the total negligence involved in this case?

 5%

(4) What is your verdict of compensatory damages for the loss of contribution for support which John Kozar would have provided for his wife, Anne Kozar, and his son, John Scott Kozar?

$76,545.40

(5) What is your verdict for compensatory damages for the loss of the value of any services which John Kozar would have performed for his wife, Anne Kozar?

$8,000.00

(6) What is your verdict for compensatory damages for the loss to his son, John Scott Kozar, of the care, attention, training and guidance which John Kozar, his father, would have given to his son had he lived?

$30,000.00

(7) What is your verdict for compensatory damages for the loss of services, advice and aid which John Kozar would have performed for his daughters, Sandra Beurkens and Pamela Murray?

$5,000.00

(8) Was John Kozar aware of the fact that the refrigerator car was falling on him, so as to sustain damages from fright and mental anguish in anticipation of death?

Yes X No ___

If you answer question number (8) "yes," what is your verdict on this element of damages?

$500.00

(9) Did John Kozar sustain conscious pain and suffering between the time he was struck by the refrigerator car and his death?

Yes ___ No X

If you answer question number (9) "yes," what is your verdict on this element of damages?

/s/ Howard Bruce Connell 
Foreman of the Jury

UNITED STATES OF AMERICA

IN THE DISTRICT COURT OF THE UNITED STATES 
FOR THE WESTERN DISTRICT OF MICHIGAN 
SOUTHERN DIVISION

ANNE P. KOZAR, Administratrix of 
the Estate of John P. Kozar, 
Deceased,

 Plaintiff,

v. CIVIL ACTION NO. 5925

THE CHESAPEAKE & OHIO RAILWAY CO., 
 Defendant.

PUNITIVE OR EXEMPLARY DAMAGES

## COUNT III.

(1) Were the officers, agents and employees of the Chesapeake and Ohio Railway Company guilty of willful, wanton, or reckless disregard for the safety of John Kozar?

Yes X No ___

If you answer question number (1) "yes," then answer question number (2).

(2) Did the Chesapeake and Ohio Railway participate in, authorize or confirm this conduct on the part of its officers, agents or employees so as to make the Chesapeake and Ohio Railway liable for punitive damages?

Yes X No ___

If you answer questions number (1) and (2) "yes," then answer the following question:

(3) What amount do you assess for punitive damages?

$70,000.00

/s/ Howard Bruce Connell
 Foreman of the Jury

———◆———

Defendant filed a motion for new trial, claiming more than seventy instances of prejudicial error. Many of the objections are repetitious and some are frivolous.

This opinion will not cover all of the objections raised by the defendant, but only some of the essential rulings of the court. The remainder of the objections will be dealt with in an Appendix.

## FACTS

To the extent that this motion challenges the verdict as being contrary to the evidence, this court must consider the evidence in the light most favorable to the verdict. Fritts v. Toledo Terminal Ry. Co., 293 F.2d 361 (6th Cir. 1961); Padgett v. Southern Ry. Co., 396 F.2d 303 (6th Cir. 1968); Jenkins v. Associated Transport, Inc., 330 F.2d 706 (6th Cir. 1964); Weekes v. Michigan Chrome & Chemical Co., 352 F.2d 603 (6th Cir. 1965); Stevens v. Continental Can Co., 308 F.2d 100 (6th Cir. 1962), cert. denied 374 U.S. 810, 83 S.Ct. 1702, 10 L.Ed. 2d 1034.

John Kozar had been an employee of the defendant for over thirty-five years at the time of his death, and was then foreman of a wrecking crew.

This wrecking crew of eight or nine men was charged with the responsibility of clearing the company's railroad beds of all the wreckage or derailments from freight or passenger trains in order to maintain the free flow of interstate commerce. This crew's task was not only essential to the railroad's operation, but because the crew had to take each wreckage situation as they found it, the job was extremely hazardous.

The crew's main equipment was a crane that rode on a set of train wheels. This crane was built by the Industrial Brownhoist Corporation, and is known as the DK–8 wrecker crane.

This crane had two hoist lines, either one of which could have been used to lift a railroad car off the ground, thereby permitting John Kozar's crew to put the derailed car back on the tracks. The auxiliary hoist was in use at the time of

John Kozar's death. This hoist, often called the "small line" or "little line," had two brakes which could control it; a hand brake and a foot brake. These brakes and the other controls of the crane were operated from the crane's cab by the wrecking crew's engineer, Joe Kierepka.

It was essential that this equipment be in excellent condition so that it would be in a state of readiness to meet all eventualities.

At the time of the accident, John Kozar and the wrecking crew were attempting to rerail a refrigerator car which had gone off the defendant's tracks near Holland, Michigan. This refrigerator car was approximately 50 feet long and weighed approximately 40 tons. This particular derailment presented the wrecking crew with a difficult task because the car was in a deep ravine and lay perpendicular to the tracks, requiring that it first be raised out of the ravine and then turned so that it would be parallel to the tracks before it could be rerailed. To complicate the situation further, the refrigerator car was upside down.

As this refrigerator car was raised out of the ravine by the DK–8's small line, the roof near one end of the refrigerator car seemed to catch near the tracks. Because of this precarious and delicate situation, John Kozar decided that it was necessary to pivot the car right where it was. He sent his men to get the railroad ties which would be used as the pivot. At that moment the refrigerator car was partially suspended over and perpendicular to the tracks. One end was ten to twelve feet off the ground. The roof near the other end of the car was caught near the tracks.

The roof of the car was not strong enough to support the car's entire weight, and so a decision as to the proper placement of the railroad ties was extremely critical, depending upon the condition and strength of the roof, the sides of the car, and the slope of the ground.

This crucial decision was solely John Kozar's responsibility.

Members of the wrecking crew testified that there were many times in the performance of their duties when it was necessary for them to go near, or even underneath, raised railroad cars. Furthermore, it was the testified consensus of the wrecking crew members that John Kozar was one of the safest men whom they knew on the railroad.

Richard Vander Molen, John Kozar's immediate superior, even testified, " * * * that John Kozar was one of the very safest men that the railroad had employed." (Tr. P. 814.) He also acknowledged that in John Kozar's thirty-five years with the defendant he was never cited for violation of the defendant's safety rules.

Furthermore, he testified that John Kozar, " * * * was very careful in his duty so that any damage [to defendant's equipment] would be held to a minimum." (Tr. P. 819.)

However, this witness also testified that it was never necessary to go underneath a railroad car and that, in any event, by the time John Kozar had sent his men to get the railroad ties the decision on where to place the ties had already been reached. This last statement, however, is placed in question by Ernest Ten Elshof, the defendant's claim agent, who stated under oath that Richard Vander Molen was not at the scene of the accident when John Kozar was killed.

Notwithstanding this conflicting evidence, it is clear that as the wrecking crew members were getting the railroad ties, John Kozar began walking parallel to the railroad car. None of his coworkers was close enough or in a position to know if he was actually underneath the car or just along side of it. When Kozar neared the end of the car that was off the ground, the refrigerator car began slowly to fall. One of his coworkers, James Kozal, yelled to him to look out. Apparently believing he was in peril, Kozar began to run in a crouched position, managed a few steps, but was crushed to death under the refrigerator car's edge.

The DK–8 had been purchased by the defendant twenty-three years before this accident. For at least five years, though, the small line and its brake system had not operated properly for the wrecking crew. During this same time the hand brake, a very powerful mechanical device, would stick and not release without great effort. Therefore, this brake could not be released fast enough in an emergency situation, and because of its defective condition was rarely used even though this was the brake that the manufacturer, Industrial Brownhoist, had recommended that its customers use whenever lifting loads in excess of 15 tons. As noted above, the refrigerator car weighed approximately 40 tons.

Furthermore, the small line's foot brake, which was regularly used by the wrecking crew, would slip or creep intermittently in a random, unpredictable pattern. "Slipping" or "creeping" occurs whenever the brake does not hold, causing the raised object to begin to fall. Normally, this process can be stopped by the engineer if he is aware of the slipping and immediately applies more pressure to the foot brake.

There were also instances when the foot brake would "kick back." This particular malfunction was described by William Ritzenheim, John Kozar's eventual successor: "When you would go to release [the small line foot brake], it would kick up real hard." (Tr. P. 195.) In that same instant that the foot brake would kick back, the brake would release. If, however, the engineer managed to reapply the brake, he could prevent the raised object from falling.

For at least four years, John Kozar's superiors were aware that the small line brake system, which included both the hand and foot brakes, was malfunctioning. On May 25, 1965, C. A. Thomas, the car superintendent of the Northern Region of the Chesapeake and Ohio Railway Company, sent a letter to John Kozar acknowledging their discussions of the brake problem. A copy of this letter was also sent to Richard Vander Molen. C. A. Thomas was also present in 1964

at the Mulliken derailment and in 1967 at the Stevensville derailment, when this crane dropped the object it was holding. Furthermore, the machinist department, the department which Richard Vander Molen insisted had responsibility for taking care of all repairs on the DK–8, was also aware of the intermittent failures in the small line brake system.

Leon Klocko, the fireman for the DK–8 wrecking crew for the four or five years before November 1967, testified that after the brake was noticed creeping "that when [the wrecking crew would] come off the job, [they'd] have to go in and have it readjusted" by the machinist.

Also, Clifford Reed, a member of the machinist department at the time of John Kozar's death, recalled that his department was constantly being asked to repair the small line brake system. He stated that normally these repairs consisted of giving the adjusting screw "from one turn to a half a turn, tightening, or whatever it required." The majority of the time, these adjustments in the small line foot brake were made in the yard " * * * because they didn't want to bring [the DK–8] into the shop. * * * [T]he shop was being used by the car department for repair of cars, and this would mean holding up that work. So it meant that we had to go outside in the yard to work on this wrecker. However, for just a small adjustment, it didn't bother us that much." (Tr. P. 297.)

Finally, Clifford Reed stated that he not only felt that he was not properly prepared to make more extensive repairs, but that "to this day * * * there [isn't] anyone on that railroad qualified to come out and say this is wrong and that is wrong. * * *" because none of the mechanics was ever provided with a book, diagram or other directions on how to repair this small line brake system. (Tr. P. 297).

The exact number of slippages or brake failures before John Kozar's death is, however, unclear. Richard Vander Molen testified that he had never been

told of any trouble with the DK-8 brake system, other than through C. A. Thomas' 1965 letter. The defendant also introduced seven monthly inspection reports of the DK-8 for the months just before John Kozar's death. Normally the inspection reports made up by the wrecking crew foreman and engineer were based only upon visual inspections. These particular reports were signed by John Kozar and Joe Kierepka and indicated that the crane was functioning properly. These reports, however, do not specifically refer to the small line brake system.

Furthermore, they are refuted by Clifford Reed's testimony that Joe Kierepka never was "satisfied with the brake. He always had problems with it."

Finally, Leon Klocko and Eugene Sczepanek also testified the brake system had malfunctioned a number of times before John Kozar's death.

Apart from this somewhat contradictory testimony it is clear that on at least five separate occasions before John Kozar's death the small line dropped the load it was holding. The first of these occurred in December 1963; the last occurred on January 9, 1968, just five weeks before John Kozar died. In spite of these several instances of brake failure, the defendant offered no evidence to show that it made any attempt to discover why the crane would fail in this random way.

On the Friday before John Kozar was killed, the small line foot brake again malfunctioned. As Joe Kierepka attempted to adjust or release the foot brake, the brake suddenly "kicked," injuring him. Again, there was no evidence to indicate that the defendant attempted to discover why this brake had randomly malfunctioned.

On the second work day following this incident, Monday, February 12, 1968, John Kozar was killed.

Within hours after the accident, the defendant had assembled its mechanic

experts. These men were informed by Joe Kierepka, "that the little line brake was on and that the car had come down with the brake on." [1] They then examined and tested the small line foot brake right at the accident scene and reported finding nothing wrong with it.

Simultaneously with this inspection of the DK-8, defendant's claim agents, under the supervision of Ernest Ten Elshof, interviewed and took statements from its employees, approximately twenty, who were present at the time of the accident. All of them were detained for approximately six hours for this purpose.

No evidence was presented, however, to show that the internal parts of the brake system were inspected, repaired or replaced.

Notwithstanding these tests, on the following Friday, the first time the DK-8 was used after the accident, Leon Klocko, Joe Kierepka's temporary replacement, found the small line foot brake "dead." He testified:

"When I applied the brake, it was just dead. There was no life to the brake at all. There are eccentrics on the linkage to your brake band. When it gets so far, they just lock the rod and there is nothing there. I mean, you could have, well, a hundred pounds on the end of that hook, and it wouldn't hold it up. There was nothing there." (Tr. P. 161.)

He then requested that it be repaired, and the machinist department adjusted the brake. Later, however, he discovered that the hand brake, when tightened, was extremely difficult to release, making it almost impossible to use.

Virgil Bosch, machine foreman for the Grand Rapids Division, sent a letter dated February 16, 1968, which embodied his findings concerning John Kozar's death, to J. F. Finnegan, his superior, the defendant's general master mechanic. J. F. Finnegan was responsible for supervising all locomotive parts, including the DK-8, in the Northern

1. Tr. p. 463. Virgil Bosch's letter of Feb. 16, 1968 to J. F. Finnegan.

Region of the Chesapeake and Ohio Railway Company.

Virgil Bosch's letter related the way John Kozar died, the inspection and testing of the DK-8 which then took place, the results of those tests, and the nature of the adjustments which were made on the small line foot brake on February 15, 1968, pursuant to the request of the wrecker engineer.

The record evidences that substantially all of these facts were known by R. Davis, assistant supervisor of safety and fire prevention, John Rickson, general locomotive foreman in Grand Rapids, C. M. Krieve, assistant superintendent, Grand Rapids Division, who was acting for the division superintendent at the time of the accident, K. F. Bomar, superintendent of the Grand Rapids Division, D. C. Deleeuw, master mechanic for all points in the Grand Rapids and Saginaw Divisions, and C. A. Thomas.

Over the next few months, however, the members of this wrecking crew continued to experience troubles with this small line foot brake.

A March 29, 1968 inspection report stated that the brake lining was glazed or worn out. Later, Joe Kierepka would not sign the April 5, 1968 monthly inspection report because he did not feel that the small line brake system was functioning properly. In March, William Ritzenheim discovered that the hand brake would not release without great effort. Also in March, at the Benton Harbor derailment, the brake "kicked * * * the minute it went to let down, the brake kicked Joe Kierepka right up." (Tr. P. 223.) Only the fact that Joe Kierepka was able to reapply pressure on the brake prevented the DK-8's load from dropping. Later that month at the Vermontville derailment, creeping occurred. William Ritzenheim, however, noticed the creeping and was able to get Joe Kierepka's attention in time to prevent the raised car from dropping. Also, in the Wyoming yards in April, the small line dropped the load it was carrying. After each of the first two incidents, "adjustments" were made, but no evidence was offered to show that the defendant made any repairs to the internal mechanism of this brake system.

William Ritzenheim testified that finally about May 8, 1968, upon his request and insistence that the brake system was "sticking," the machine department tore the brake system down in order to examine its internal operation.

The records of what was discovered during this repair were not available at the trial, or for discovery purposes, for it was the defendant's claim that these records, along with all of the other records relating to the repairs made on the DK-8 wrecker crane following John Kozar's death, were stolen.[2]

Clifford Reed and William Ritzenheim were, however, able to testify that during this repair it was discovered that the main adjustment rod for the small line foot brake needed to be straightened out; the shaft to which the main adjustment rod was attached was rough, rusty and scored, and needed to be smoothed out; the central brake lining was "loose" and needed to be replaced; and that this whole piece of machinery was filthy and covered with grease and dirt. They also testified that the main adjustment rod, the shaft which attached to it and the central brake lining were repaired or replaced. There was no evidence presented, however, to show that the small line hand brake was repaired so that it would function properly.

2. The defendant gave this reason for its failure to produce these documents, even though defendant made no showing to the court of having reported the alleged theft to the police. In view of the fact that possibly the only reason that one would have for stealing these records would be to suppress the evidence found on these records, it must be noted that the defendant's officers, agents and employees were the only ones with access to these reports. Mrs. Kozar did not have access to them.

Later, the plaintiff's mechanical engineering expert, Professor Hinkle, testified that after taking into consideration all of the facts relating to the condition of the brake and its random failure, in his opinion the condition of the brake system, as found during the May 1968 repair, existed at the time of John Kozar's death, and that that condition was the cause of the DK–8's dropping the refrigerator car.

More specifically, he concluded that the small line hand brake and foot brake were designed to operate either independently or simultaneously, depending on the type of job being performed, that the hand brake was designed to be used for lifting heavier loads or for holding loads off the ground, that if either brake was not functioning properly, the brake system was defective, that the hand brake was defective because it would not release easily, and that if the hand brake had been in use at the time of the accident, the box car would not have fallen. He also concluded that the brake lining removed at the May 8, 1968 repair was defective, that it had been that way for a number of years, and that its defective nature—the fact it could "float" an inch or two—would cause the brake system to act in a random, unpredictable fashion. He also concluded that if the foot brake was partially defective, failure to use the hand brake would increase the likelihood the small line brake system would randomly fail. Furthermore, he stated while he could not be sure of the exact physical cause for the foot brake "kicking," though it sounded to him as if something was "sticking very sharply" like "the shaft [being] a little rusty," he was certain such a physical explanation existed and would not have been that complicated a process to try and find.

Finally, he concluded that in light of the random failure of this small line brake system during the past couple of years, this system, with the powerful reserve capacity that was built into it, must not have been properly inspected during that period.

## PUNITIVE DAMAGES

Since the defendant's challenge to the plaintiff's right to recover punitive damages under the Federal Employers' Liability Act presents the most significant legal issue in this case, it is discussed first.

Throughout the trial the defendant maintained that punitive damages were not recoverable in a suit brought pursuant to the Federal Employers' Liability Act. This court disagrees. After considering the pretrial briefs of the parties, this court concluded that punitive damages were recoverable in proper cases under the Federal Employers' Liability Act, and permitted the jury to consider this issue.

This court has reviewed a substantial portion of the Congressional history of the Federal Employers' Liability Act. It is replete with statements of the Act's purpose and scope.

Because of the clear and unambiguous expression of Congressional intent found in the Congressional Record, selected quotations are included in this opinion. The Senate Judiciary Committee's Report on the 1910 amendments to the Federal Employers' Liability Act contains the following relevant statements:

"This subject is referred to here only for the purpose of calling upon Congress to make entirely manifest the good faith of the legislature in the enactment of the employers' liability law, which places such stringent liability upon the railroads for injuries to their employees as to compel the highest safeguarding of the lives and limbs of the men in this dangerous employment. The tremendous loss of life and limb on the railroads of this country is appalling. The total casualties to train men on the interstate railroads of the United States for the year 1908 was 281,645.

"It was the intention of Congress in the enactment of this law originally and it may be presumed to be the in-

tention of the present Congress to shift the burden of the loss resulting from these casualties from 'those least able to bear it' and place it upon those who can, as the Supreme Court said in the Taylor case [St. Louis, Iron Mountain & Southern Ry. Co. v. Taylor] (211 [210] U.S., 281 [28 S.Ct. 616, 52 L.Ed. 1061]), 'measurably control their causes.'

"The passage of the original act and the perfection thereof by the amendments herein proposed stand forth as a declaration of public policy to radically change, as far as congressional power can extend, those rules of the common law which the President in a recent speech at Chicago characterized as 'unjust.' President Taft in his address at Chicago September 16, 1909, referred 'to the continuance of unjust rules of law exempting employers from liability for accidents to laborers.'

"*This public policy which we now declare is based upon the failure of the common-law rules as to liability for accident to meet the modern industrial conditions, and is based not alone upon the failure of these rules in the United States, but their failure in other countries as well.* Mr. Asquith, present prime minister of England, said:

" ' It was revolting to sentiment and judgment that men who met with accidents through the necessary exigencies of daily occupation should be a charge upon their own families.'

"The passage of the law was urged upon the strongest and highest considerations of justice and promotion of the public welfare. It was largely influenced by the strong message of President Roosevelt to the Sixtieth Congress in December, 1907, in which the basis of the legislation was clearly and strongly placed upon the ground of justice to the railroad workmen of this country and in which legislation was urged to the limit of congressional power upon this subject. In the message President Roosevelt said:

" ' *The practice of putting the entire burden of loss to life or limb upon the victim or the victim's family is a form of social injustice in which the United States stands in unenviable prominence.* In both our federal and our state legislation we have, with few exceptions, scarcely gone further than the repeal of the fellow-servant principle of the old law of liability, and in some of our States even this slight modification of a completely outgrown principle has not yet been secured. The legislation of the rest of the industrial world stands out in striking contrast to our backwardness in this respect. Since 1895 practically every country in Europe, together with Great Britain, New Zealand, Australia, British Columbia, and the Cape of Good Hope has enacted legislation embodying in one form or another the complete recognition of the principle which places upon the employer the entire trade risk in the various lines of industry.' 45 Cong.Rec. 4041 (1910). \* \* \*

"In considering the advisability of amending the act entitled "An act relating to the liability of common carriers by railroads to their employees in certain cases," approved April 22, 1908, it is important at the outset to understand that the purpose of Congress in the passage of this act was to extend further protection to employees. This was its manifest purpose, as is apparent from a consideration of the circumstances of its enactment. It is manifest from a consideration of the reports, both of the Senate and House committees, when the measure was pending before those bodies prior to its enactment, *that the purpose of the statute was to extend and enlarge the remedy provided by law to employees engaged in interstate commerce in cases of death or injury to such employees while engaged in such service. No purpose or intent on the part of Congress can be found to limit or to take away from such an employee any right theretofore existing by which such*

*employees were entitled to a more extended remedy than that conferred upon them by the act."* Id. at 4044. (Emphasis supplied.)

This clear statement is compellingly conclusive that punitive damages remained available in suits by railroad employees and their beneficiaries against the railroads.

President Theodore Roosevelt and President Howard Taft distinctly recognized the "unjust" nature of those court-made defenses which the Federal Employers' Liability Act sought to abolish. Encouraged by this Presidential support and by an aroused national concern to erase unjust defenses which courts had built into the common law, Congress passed an act which ended these common law defenses.[3]

Legislative history indicates that the Act expressly changed the common law in the following respects only:[4]

(1) The Act authorizes recovery of damages for death resulting from neg-

---

3. Further evidence of the paramount concern which was given to the lessening of those heavy losses which railroad employees suffered is found in Johnson v. Southern Pacific Company, 196 U.S. 1, at 19, 25 S.Ct. 158, at 162, 49 L.Ed. 363 (1904):

> "President Harrison, in his annual messages of 1889, 1890, 1891, and 1892, earnestly urged upon Congress the necessity of legislation to obviate and reduce the loss of life and the injuries due to the prevailing method of coupling and braking. In his first message he said:
>
> " 'It is a reproach to our civilization that any class of American workmen should, in the pursuit of a necessary and useful vocation, be subjected to a peril of life and limb as great as that of a soldier in time of war.' "

4. The majority report of the House Judiciary Committee first recommended that the proposed Act be passed. It then continued:

> "The purpose of this bill is to change the common-law liability of employers of labor in this line of commerce, for personal injuries received by employees in the service. It abolishes the strict common-law rule of liability which bars a recovery for the personal injury or death of an employee, occasioned by the negligence of a fellow-servant. It also relaxes the common-law rule which makes contributory negligence a defense to claims for such injuries. It permits a recovery by an employee for an injury caused by the negligence of a coemployee; nor is such a recovery barred even though the injured one contributed by his own negligence to the injury. The amount of the recovery, however, is diminished in the same degree that the negligence of the injured one contributed to the injury. It makes each party responsible for his own negli-

gence, and requires each to bear the burden thereof. The bill also provides that, to the extent that any contract, rule, or regulation seeks to exempt the employer from liability created by this act, to that extent such contract, rule, or regulation shall be void.

> "Many of the States have already changed the common-law rule in these particulars, and by this bill it is hoped to fix a uniform rule of liability throughout the Union with reference to the liability of common carriers to their employees." 42 Cong.Rec. 4434 (1908).

During debate on the 1908 bill, Congressman Henry of Texas re-emphasized the bill's purpose:

> "Let me submit in brief language the provisions of this measure, in order that we may thoroughly understand it. At common law there was no right of recovery for damages for death resulting from negligence; by this act we authorize recovery for injury or death. At common law there could be no recovery against the employer for the neglect of fellow-servants engaged in common employment; by this act we abrogate that ancient doctrine and permit recovery for the negligence of the officers, agents, or employees, although the one guilty of negligence is a fellow-servant of the one injured or killed. At common law the one who had contributed by his own negligence to his injury could not recover, and also for the negligence of another which had been the concurring cause; by this law we authorize a recovery in such cases and only demand that the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. Furthermore, if the damage is attributable to the violation of a statute by the employer, contributory negligence can not be imputed to the employee. At com-

mon law the employer could bind the employee by contract to renounce his right to damage in cases of injury in the course of employment; we here abrogate that rule of the common law. This statute forbids such contract. We abolish the common-law doctrine of fellow-servant, a doctrine long ago discontinued by many States. Hence, we have changed four rules of the common law. *These changes are in obedience to the demands of humanity, justice, and the sacred rights of millions of American citizens engaged in hazardous employments.*

"Therefore, Mr. Speaker, the common law is changed in four respects. Favoring most cordially its every provision, I hope that this bill will be promptly passed. [Loud applause.]"

Senator Dolliver of Iowa was in charge of the proposed Act when it reached the Senate floor in 1908. He explained the purpose of the legislation to his colleagues:

"I will now briefly state to the Senate exactly what this bill proposes. It contains four substantive propositions.

"First, it modifies the old law of the negligence of coemployees. The old law, which took root in the United States two generations ago, was to the effect that an employee injured by the negligence of a fellow-workman could not recover. That was based upon a decision, I understand, rendered by Chief Justice Shaw of the supreme court of Massachausetts as far ago as 1842, a decision which Judge Dillon in an article in the American Law Review says is the fountain head of American jurisprudence on that subject, except in so far as it rests on immemorial precedent.

"The proposition was that an employee injured by the negligence of a fellow-workman could not recover. This bill abolishes that doctrine and gives the employee the right to recover for injuries arising from the negligence of his fellow-workman. That is the first proposition.

*"The second proposition modifies the law whereby in other generations workmen were held by the court to assume the risks arising from defective machinery. That was an inheritance, I reckon, of the common law, and at the time the courts originally established the doctrine it had some sense in it and a little justice. There was some reason why a man working with simple machinery should look to it that the machinery with which he worked was in good order. But that doctrine is obsolete as applied to the present-day occupations of those workmen who are employed by the common carriers of the world.* It would require a brakeman to know all about the machinery of a freight train, though it may be a half mile long, as he goes out upon his day's work. *Everybody with a moderate sense of justice must see that the common law applicable to the assumption of risks for deficient machinery has no rational application to the complex industrial concerns of our own time.*

"In the third place, this proposed statute modifies radically the law of contributory negligence. As administered by our courts it has been uniformly held that an employee suffering an injury to which his own negligence contributed can not, by reason of that participation in the injury, have any recovery at law. This proposed statute liberalizes that doctrine of the law. It is based upon the theory that where an injury occurs partly by reason of the negligence of the employer and partly by reason of the negligence of an employee the jury ought to determine what portion of the injury arises from the negligence of the plaintiff and take away from the sum total of his damages allowed that part which can properly be apportioned to his own negligence. That principle has been called in some of the books the 'doctrine of comparative negligence.' "In the fourth place, this proposed bill undertakes to modify somewhat the common law applicable to certain agreements or contracts made between employers and their workmen in which the latter agree, in consideration of some form of insurance or indemnity fund, to give up the right to sue in the courts. It has been held, as a matter of public policy, that a workman can not contract himself out of his right or the right of his legal representatives to recover for damages. That is to say, the courts have held that it is against public policy to sustain a contract by which a workman merely by consideration of his wages and his employment agrees to withhold any claim for damages in case of his injury. But many insurance societies have grown up in connection with the operation of our railways which not only undertake to repay a man for damages arising out of injuries, but have also certain other features in the nature of sick benefits and other insurance. These

ligence. The common law, as then interpreted, did not allow such recovery. See in this regard Moragne v. States Marine Lines, Inc., 398 U.S. 375 [90 S.Ct. 1772, 26 L.Ed.2d 339] (1970).

(2) The Act abrogates the fellow-servant rule and permits recovery for the negligence of officers, agents or fellow-employees.

(3) The Act eliminates contributory negligence as a bar to liability; an employee's own negligence contributing to his injury is material only to reduction of damages.

(4) The Act prohibits a contract by the employee renouncing his right to sue for damages in the event of injury.

(5) The Act eliminates the doctrine of assumption of risk as "obsolete" as applied "to the complex industrial concerns of our time."

Unquestionably, then, Congress intended the Federal Employers' Liability Act to be basically an act of exclusion, designed to cut off certain common law defenses available to railroads and to narrow the area of objection by railroads, to claims of their employees for loss of life and limb, which are in the words of a Supreme Court opinion "consumed in [the railroad's] operations." Wilkerson v. McCarthy, 336 U.S. 53, at 68, 69 S.Ct. 413, 93 L.Ed. 497 (1949). Furthermore, the Senate Report to the 1910 Amendments makes it crystal clear that "[n]o purpose or intent on the part of Congress can be found to limit or to take away from such an employee any right theretofore existing by which such employees were entitled to a more extended remedy than that conferred upon them by the act,"[5] and punitive damages are available as a right of action to the plaintiff in this suit.

A review of court decisions further demonstrates that punitive damage remedy is intact, a vital and relevant rule of law available in proper cases involving injury or death to railroad employees.

This court found only six cases which discussed punitive damages under this act: Cain v. Southern Ry. Co., 199 F. 211 (C.C.E.D.Tenn.1911); Ennis v. Yazoo & M. V. Ry. Co., 118 Miss. 509, 79 So. 73 (1918); Helsel v. Pennsylvania R. Co., 84 F.Supp. 296 (E.D.N.Y.1949); Missouri-K–T R. Co. of Texas v. Ridgway, 191 F.2d 363 (8th Cir.1951); Gunnip v. Warner Co., 43 F.R.D. 365 (E.D. Pa.1968); Petition of Den Norske Amerikalinje A/S, 276 F.Supp. 163 (N.D. Ohio 1967), reversed United States Steel Corp. v. Fuhrman, 407 F.2d 1143 (6th Cir.1969), cert. den. 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542. Of these, only Fuhrman seems to stand as authority.

Cain was decided under the 1908 Act, before the 1910 addition of § 9, the survival section. Essentially, Cain held, that if an employee died as a result of his employer's conduct, the 1908 Act would not allow his beneficiaries to recover anything but the pecuniary loss of the employee's life. Significantly, that case did not hold that an *injured* but surviving employee could not recover punitive damages from his employer in an action brought under the 1908 Act. Nor did that case hold that the 1910 amendments would not permit survival of punitive damages in the proper case. Furthermore, this court's analysis of the

have been regarded by the courts as valid and binding agreements.

"This proposed law means simply that when a workman sues for injury for which he is entitled to recover he shall not have his recovery defeated by reason of one of these insurance agreements; but it also says that in case the railway has contributed anything to the insurance fund which he has enjoyed the amount that the railway has contributed shall be deducted in the calculation of the damages which he is entitled to recover.

"These are the four propositions contained in this bill, *and I have an idea that there is not a member of the Senate who does not recognize the equity and justice involved in all four of them.*" Id. 4527 (1908).

5. 45 Cong.Rec. 4044 (1910).

Federal Employers' Liability Act's congressional history compels the conclusion that Congress intended *to preserve to "* * * such employees any rights theretofore existing by which such employees were entitled to a more extended remedy than that conferred upon them by the act."* 45 Cong.Rec. 4044.

In Ennis, the Mississippi Supreme Court ruled that punitive damages could be recovered by the beneficiaries of a deceased railroad employee. The opinion cites no authority for its holding and it is unclear whether that court relied upon the Federal Employers' Liability Act, or the state common law.

A brief reading of Helsel and Ridgway establishes that they only stand for the proposition that, if an employee is injured by his employer's negligence, that employee may recover only "on a compensatory, not a punitive basis." 84 F.Supp. at 299. These courts were simply restating the well accepted rule that a jury, when awarding damages for negligent conduct, may not attempt to punish the tortfeasor.

In Gunnip, the court did not actually reach the question of whether punitive damages were able to be awarded under the Jones Act, 46 U.S.C. § 688, an Act which secured for seamen those rights already provided railroad workers under the Federal Employers' Liability Act. DeZon v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943). The court, however, did point out that DeZon, which ruled that "damages may be recovered under the Jones Act only for negligence," 318 U.S. at 671, 63 S.Ct. at 820, does not necessarily preclude a recovery for punitive damages.

"But these statements were made in response to an argument that recovery could be under the Jones Act for liability without fault. The proposed amendment in the case at bar makes a claim for damages for fault greater than negligence. Thus it is arguable that an action for punitive damages is not inconsistent with the intention Congress expressed in the Jones Act." 43 F.R.D. at 368.

In Den Norske, District Judge Connell ruled that punitive damages were recoverable under the Jones Act. The Sixth Circuit, in Fuhrman, reversed the District Judge's award of sixteen million dollars in punitive damages against the defendant corporation, but did so because the actions of the captain "were neither authorized nor ratified by United States Steel." 407 F.2d at 1148.

The court, however, did provide guidelines for awarding punitive damages:

"We think the better rule is that punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident. Punitive damages also may be recoverable if the acts complained of were those of an unfit master and the owner was reckless in employing him." 407 F.2d at 1148.

Since this case was brought under the Jones Act, 276 F.Supp. at 174, and thus the Federal Employers' Liability Act, this court is persuaded that in this circuit, punitive damages are recoverable under the Federal Employers' Liability Act.

The defendant contends, however, that the language in Fuhrman applies only to admiralty cases, because only that area of the law has had a long tradition of awarding punitive damages. The defendant misconceives the law. While it is true that other admiralty cases have favorably considered this issue, Den Norske was the first case to actually award punitive damages against a maritime tortfeasor.[6]

In fact, the state of the federal common law before the passage of this Act, the underlying policies for punitive damages and the constitutional basis for this

6. This was recognized by the parties in Den Norske and by Judge Connell. 276 F.Supp. at 174.

Act convincingly support the legislative history of this Act and compel the opposite result. Punitive damages are recoverable by a railroad employee under the Federal Employers' Liability Act, just as they were before the Act's passage.

Day v. Woodworth, 13 How. 363, 54 U.S. 363, 14 L.Ed. 181 (1851), was the first Supreme Court case to permit a plaintiff to recover punitive damages in an action at law. Even in this early case, the court considerd the doctrine so well established that it would "not admit of argument."

"It is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff. We are aware that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument. By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of a civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured. In many civil actions, such as libel, slander, seduction, &c., the wrong done to the plaintiff is incapable of being measured by a money standard; and the damages assessed depend on the circumstances, showing the degree of moral turpitude or atrocity of the defendant's conduct, and may properly be termed exemplary or vindictive rather than compensatory.

"In actions of trespass, where the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff which he would have been entitled to recover, had the injury been inflicted without design or intention, something farther by way of punishment or example, which has sometimes been called 'smart money.' This has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case. It must be evident, also, that as it depends upon the degree of malice, wantonness, oppression, or outrage of the defendant's conduct, the punishment of his delinquency cannot be measured by the expenses of the plaintiff in prosecuting his suit." 13 How. at 371, 54 U.S. at 371

This rule was later applied to railroads whose employees acted wilfully, wantonly, or with reckless disregard for the rights of others. Philadelphia, W. & B. Ry. Co. v. Quigley, 21 How. 202, 62 U.S. 202, 16 L.Ed. 73 (1858). Milwaukee & St. Paul Ry. Co. v. Arms, 91 U.S. 489, 23 L.Ed. 374 (1876), summarized the law:

"It is undoubtedly true that the allowance of any thing more than an adequate pecuniary indemnity for a wrong suffered is a great departure from the principle on which damages in civil suits are awarded. But although, as a *general rule*, the plaintiff recovers merely such indemnity, yet the *doctrine is too well settled now to be shaken*, that exemplary damages may in certain cases be assesed. As the question of intention is always material in an action of tort, and as the circumstances which characterize the transaction are, therefore, proper to be weighed by the jury in fixing the compensation of the injured party, it may well be considered whether the doctrine of exemplary damages cannot be reconciled with the idea, that compensation alone is the true measure of redress.

"But jurists have chosen to place this doctrine on the ground, not that the sufferer is to be recompensed, but that the offender is to be punished; and, although some text-writers and courts have questioned *its* soundness,

it has been accepted as the general rule in England and in most of the States of this country. 1 Redf. on Railw. 576; Sedg. on Measure of Dam., 4th ed., ch. 18 and note, where the cases are collected and reviewed. It has also received the sanction of this court. Discussed and recognized in Day v. Woodworth, 13 How. [363] 371, [14 L.Ed. 181], it was more accurately stated in The Philadelphia, Wilmington, & Baltimore R.R. Company v. Quigley, 21 How. [202] 213 [16 L.Ed. 73]. One of the errors assigned was that the Circuit Court did not place any limit on the power of the jury to give exemplary damages, if in their opinion they were called for. Mr. Justice Campell, who delivered the opinion of the court, said,—

" 'In Day v. Woodworth this court recognized the power of the jury in certain actions of tort to assess against the tort-feasor punitive or exemplary damages. Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act: the word implies that the wrong complained of was conceived in the spirit of mischief, or criminal indifference to civil obligations.'

"Although this rule was announced in an action for libel, it is equally applicable to suits for personal injuries received through the negligence of others. Redress commensurate to such injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done wilfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them.

In that case, the jury are authorized, for the sake of public example, to give such additional damages as the circumstances require. The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages." 91 U.S. at 492, 493.

Subsequent federal cases continued to consider punitive damages to be a well settled aspect of the federal common law. *Juries were permitted to consider this element of damages whenever "the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations."* Philadelphia, W. & B. Ry. Co. v. Quigley, 21 How. at 214, 62 U.S. at 214; Missouri, Pac. Ry. Co. v. Humes, 115 U.S. 512, 6 S.Ct. 110, 29 L.Ed. 463 (1885); Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886); Denver & R. G. Ry. Co. v. Harris, 122 U.S. 597, 7 S.Ct. 1286, 30 L.Ed. 1146 (1887); Brown v. Memphis & C. Ry. Co., 7 F. 51 (C.C.W.D.Tenn. 1881); Gallena v. Hot Springs Ry., 13 F. 116 (C.C.E.D.Ark.1882); Brown v. Evans, 17 F. 912 (C.C.D.Nev.1883); Fell v. Northern Pac. Ry. Co., 44 F. 248 (C.C.D.N.D.1890); Winters v. Cowen, 90 F. 99 (C.C.N.D.Ohio 1899), aff'd. 96 F. 929 (6th Cir. 1899).

Unquestionably, then, before the passage of the Federal Employers' Liability Act, a railroad which wilfully, wantonly, or recklessly disregarded the rights or safety of others, or recklessly disregarded an imposed civil obligation, could be liable for punitive damages.

These cases also establish the reason why punitive damages are permitted. The common law courts were concerned about stopping such wilfull, wanton or reckless conduct. Therefore, they developed the concept of punitive damages— damages not measured in terms of harm or loss to the plaintiff, but in proportion to the maliciousness or recklessness of the defendant—as a deterrent to such conduct. By imposing a financial penalty upon the defendant, one which was above and beyond the loss to the plaintiff, the courts hoped, for public weal, to

eliminate that wrongful conduct which was quasi-criminal in nature.

Patently, the doctrine of punitive damages was a well established part of the common law when, during the last decade and a half of the nineteenth century, Congress began to consider the need to alter the common law remedies available to railroad employees. The major impetus for the Federal Employers' Liability Act's eventual passage was the ineffectiveness of the common law doctrine of negligence to equitably distribute the cost of the loss of life and limb of the employees in the highly hazardous railroad industry. In most circumstances, the common law defenses of contributory negligence, assumption of risk, and the fellow-servant rule became an insurmountable barrier to any attempt by a railroad employee to sue his employer for damages. Therefore, Congress passed an Act which modified or eliminated these defenses.

In Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), Mr. Justice Brennan, speaking for the Court, cited Griffith, The Vindication of a National Policy Under the Federal Employers' Liability Act, 18 Law and Contempt Prob. 160 (1953), as a "comprehensive survey of the history of the FELA." 352 U.S. at 507, n. 15, 77 S.Ct. at 449. This court has found that article extremely valuable in putting the Federal Employers' Liability Act into proper historical perspective.

One of the guiding apostles of justice for railroad men in their effort to eliminate the judge-created defenses which defeated just recovery to injured, maimed and killed railroad employees was Edward A. Moseley. He was not a railroad man; in his early life he was a seaman. He became the first Secretary of the Interstate Commerce Commission in 1887 and he exerted a profound effect upon congressional legislation of the Federal Employers' Liability Act.

It is more than coincidence that the intent of Congress was to "[place] such stringent liability upon the railroads for injuries to their employees as to compel the highest safeguarding of the lives and limbs of men in this dangerous employment." Moseley thus planted the Federal Employers' Liability Act as nearly as he could within the theory of warranty of seaworthiness doctrine available to seamen.

Just as the later doctrine shifted the burden of loss resulting from casualties at sea upon the shipowner, because the owner was measurably able to control their cause, so does the Federal Employers' Liability Act.

The constitutionality of the Federal Employers' Liability Act was upheld in Mondou v. New York, N.H. & H. Ry. Co., 223 U.S. 1, 49–51, 32 S.Ct. 169, 174–175, 56 L.Ed. 327 (1912):

"We come, then, to inquire whether Congress has exceeded its power in that regard by prescribing the regulations embodied in the present act. It is objected that it has, (1) because the abrogation of the fellow-servant rule, the extension of the carrier's liability to cases of death, and the restriction of the defenses of contributory negligence and assumption of risk, have no tendency to promote the safety of the employees, or to advance the commerce in which they are engaged;

"Briefly stated, the departures from the common law made by the portions of the act against which the first objection is leveled are these: (a) The rule that the negligence of one employee resulting in injury to another was not to be attributed to their common employer is displaced by a rule imposing upon the employer responsibility for such an injury, as was done at common law when the injured person was not an employee; (b) the rule exonerating an employer from liability for injury sustained by an employee through the concurring negligence of the employer and the employee is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employees contributes to the injury, and in other

instances is displaced by the rule of comparative negligence, whereby the exoneration is only from a proportional part of the damages corresponding to the amount of negligence attributable to the employee; (c) the rule that an employee was deemed to assume the risk of injury, even if due to the employer's negligence, where the employee voluntarily entered or remained in the service with an actual or presumed knowledge of the conditions out of which the risk arose, is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employees contributed to the injury; and (d) the rule denying a right of action for the death of one person, caused by the wrongful act or neglect of another, is displaced by a rule vesting such a right of action in the personal representatives of the deceased, for the benefit of designated relatives.

"Of the objection to these changes it is enough to observe:

"First. 'A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will * * * of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.'

"Second. The natural tendency of the changes described is to impel the carriers to avoid or prevent the negligent acts and omissions which are made the bases of the rights of recovery which the statute creates and defines; and as whatever makes for that end tends to promote the safety of the employees and to advance the commerce in which they are engaged, we entertain no doubt that in making those changes Congress acted within the limits of the discretion confided to it by the Constitution."

This review of federal common law, the policy underlying punitive damages and the constitutional basis for this Act, further evidences the vitality, relevancy and availability of punitive damages to injured railroad employees and their beneficiaries.

First, defendant has failed to offer any persuasive reason or theory—nor can one be imagined—why Congress would pass an Act "which places such stringent liability upon the railroads for injuries to their employees as to compel the highest safeguarding of the lives and limbs of men in this dangerous employment," and at the same time have intended to have this same Act repeal, sub silentio, a common law remedy which also fostered the safety and humanitarian welfare of these very same employees and their dependents.

Furthermore, the Federal Employers' Liability Act's constitutional underpinning is, unquestionably, that by economically pressuring the railroad into eliminating negligent conduct, it has a substantial effect on the promotion of interstate commerce. It would be anomalous for this court, then, to rule that Congress also intended that this Act eliminate the doctrine of punitive damages which, to the extent it helps prevent accidents caused by a railroad's willful, wanton or reckless misconduct, also promotes interstate commerce, without some congressional indication of such exclusion.

Certainly something more needs to be shown than the fact that punitive damages have not been awarded to a railroad employee since the Act's passage.

In Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 1784, 26 L.Ed.2d 339 (1970), the Supreme Court concluded that the Congress must give an "affirmative indication of an intent to preclude" a particular class of cases from the previously established common law or legislative framework before a court should construe a statute as

356

making such an exclusion, especially in the area of man's "unalienable right to life."

Chief Justice Chase, sitting on Circuit in The Sea Gull, 21 Fed.Cas.No.12,578, p. 909 (C.C.M.D.1865), remarked:

"there are cases indeed, in which it has been held that in a suit at law no redress can be had by the surviving representative for injuries occasioned by the death of one through the wrong of another; but these are all common-law cases, and the common law has its peculiar rules in relation to this subject, traceable to the feudal system and its forfeitures, * * * *and certainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules." Id., at 910. Moragne v. State Marine Lines, Inc., 398 U.S. at 387, 90 S.Ct. at 1781.*

It is apropos, as Chief Justice Chase observed—*certainly it better becomes the humane character of proceedings in FELA to give rather than withhold the remedy of punitive damages, when not required to withhold it by established and inflexible rules.* Because while FELA is available to single instances of negligence, punitive damages are available, as here, to accumulated instances of negligence, which by their character of accumulation, authorization and ratification mature into an intention of reckless disregard for the safety of others.

Defendant in urging unavailability of punitive damages to plaintiff, seeks to make a striking departure from the results dictated by elementary principles of the law of remedies. It infers that FELA abrogates the common law remedy action of punitive damages.

The message of FELA is that it does not by its own force abrogate the availability of the logical punitive damage remedy in this case. There is no intention that the Act have the effect of foreclosing punitive damages, which are also appropriate to effectuate the policy declared by Congress in the Federal Employers' Liability Act.

Finally, the history of the judicial enforcement of the Federal Employers' Liability Act has clearly demonstrated that the court-added restrictions, frustrating congressional purpose, are jurisprudentially unsound and wholly unjustified.[7] Therefore, this court will not judicially legislate the unwarranted restriction sought by the defendant, a restriction which runs counter to the humanitarian purposes of this Act, without an unequivocal manifestation of congressional intent.

Defendant, however, has failed to offer any evidence or law that the Federal Employers' Liability Act was intended to give railroads preferential treatment with respect to punitive damages.

Therefore, I find that the congressional intent, developed—as was the admiralty doctrine of seaworthiness—out of "a special solicitude for the welfare of those men who undertook to venture upon this

7. In Wilkerson v. McCarthy, supra, Mr. Justice Douglas described the unfriendly reception that courts incorrectly gave this act:

"In the first place, a great maze of restrictive interpretations were engrafted on the Act, constructions that deprived the beneficiaries of many of the intended benefits of the legislation.
* * * * *
"In the second place, doubtful questions of fact were taken from the jury and resolved by the courts in favor of the employer. This Court led the way

in overturning jury verdicts rendered for employees.
* * * * *
"And so it was that a goodly portion of the relief which Congress had provided employees was withheld from them." 336 U.S. at 69, 69 S.Ct. at 421. In Rogers v. Missouri Pacific R. Co., supra, the court reaffirmed its concern that the proper administration of this Act should not be eroded "by narrow and niggardly construction." 352 U.S. at 509, 77 S.Ct. 443.

hazardous and unpredictable"[8] occupation, was to leave intact the existing common law regarding punitive damages. Three separate threads of analysis—statutory content, legislative history, and unambiguous congressional purpose and policy—converge to compel this conclusion. Defendant's argument to the contrary must fail.

■ Accordingly, plaintiff had the right to recover punitive damages in this suit, providing she could establish that the Chesapeake and Ohio Railway Company acted wilfully, wantonly, or with reckless disregard for the safety of John Kozar. It can be assumed that the jury's verdict, following a charge to this effect, was calculated to fulfill the basic purpose of both a punitive damage award and the Federal Employers' Liability Act: to place a burden upon a wrongdoer sufficient to deter severe violations of common law and statutory duties.

(a) *Facts.*

The defendant claims, however, that there is no evidence to support this finding by the jury.

■■ The focal point of judicial review of the jury's conclusions is a determination of "the reasonableness of the particular inference or conclusion drawn by the jury. * * * The very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520.

■ This very cautious and prudent *approach when reviewing jury findings is axiomatic;* its wisdom, at least in theory, is virtually unchallenged. Conti-

nental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); 5 Moore's Federal Practice § 50.02 [1] (1969), and cases cited therein. A substitution of the court's judgment for that of the jury would be a violation of this well-founded rule as well as of the command of the Seventh Amendment that "[i]n suits at common law * * * the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any court of the United States, than according to the rules of common law."

Trial judges, when ruling on motions to set aside verdicts, must use care not to go out of the way to upset the jury's verdict, while simultaneously purporting to apply the strict standard of review set forth above. Such an aberration has the effect of usurping the function of the jury, thus diluting the protection guaranteed by the Bill of Rights.

The Restatement of Torts 2d, § 500, provided an explanation of punitive damages for the jury.[9]

"The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

First, the testimony of Clifford Reed, Eugene Sczepanek and Leon Klocko evidences that the small line brake system had randomly malfunctioned for a number of years before the accident. This evidence was supported by the C. A. Thomas letter of May 25, 1965, the answers to Interrogatory Number 20,[10]

---

8. Moragne v. State Marine Lines, Inc., 398 U.S. at 387, 90 S.Ct. at 1780.

9. Jury Instructions, Tr. p. 64.

10. Interrogatory Number 20 and its Answers evidence that on two separate occasions before John Kozar's death, near Mulliken, Michigan, in 1964, and near

Plaintiff's Exhibit Number 14,[11] and the uncontradicted testimony that the hand brake was essentially inoperable over a number of years.

Professor Hinkle's testimony provided the jury with an explanation for the brake system's random failure. The foot brake and the hand brake were made to operate independently of each other, or simultaneously. It is the same brake, with two different ways of applying it. Both should be in working order for maximum braking efficiency. If it cannot work independently or simultaneously, there is something wrong. The manual states that the foot brake is to be used for comparatively light loads, but for heavier loads and for holding loads in suspension, the hand brake should be used.

If the brake system was not in good condition, Professor Hinkle concluded that the foot brake alone could not always function properly with these heavier loads. Furthermore, it was his opinion that the brake lining was so loose that it could "float" an inch or two, causing the brake to act in the unpredictable manner described by the evidence.

There was appreciable wear on the back side of the brake lining where it had been torn in four places. In one portion of the brake there was almost one half as much wear on the side that was not supposed to move very much as on the side near the brake drum, which indicated it must have been that way for several years.

It was also Professor Hinkle's opinion that the small line brake system was defective and in a highly dangerous condition.

Finally, in light of four other factors —Professor Hinkle's conclusion that

the brake must have been inadequately inspected and repaired for a number of years before the accident, his conclusion that the foot brake's "kicking" was caused by something like a rusty shaft sticking, the continuing failure of the brake system up to the May 8, 1968 repair, and the defendant's claim that the repair records were stolen—the discovery at the May 8, 1968 repair of the rusty, scored shaft and the bent main adjustment rod also provided the jury with an explanation for the brake system's random malfunctioning before John Kozar's death.

The evidence was also sufficient to substantially support the jury's conclusion that before the accident only superficial inspections were performed and only minor repairs and adjustments were made to this brake system. Clifford Reed's testimony compels this judgment. So, also do the Answers to Interrogatory Number 20,[12] and Professor Hinkle's testimony.

Clifford Reed's testimony even evidences that the machinists were in fact never able to make a more detailed examination because they were never provided with instructions or materials on how the crane should actually operate or be adjusted.

Professor Hinkle observed that each physical phenomena has a physical explanation and that it would not have been that complicated a process to have tried to discover the physical cause for this brake system's random failure.

■ Since the wrecker crew's job was so highly hazardous, requiring perfectly functioning equipment, the jury's conclusion that employees of the defendant had intentionally failed to properly inspect and repair the DK–8, knowing, or having reason to know not only of the

Stevensville, Michigan, in 1967, C. A. Thomas was present when the DK–8 dropped equipment that it was holding. Yet the defendant was unable to explain the cause of these failures or whether there had ever been any inspection or repairs made on the DK–8 following these incidents.

11. Exhibit 14 evidences, in part, that the DK–8 dropped equipment in 1963 at the Livingston derailment, and in January 1968 at the Mulliken derailment.

12. See Footnote 10.

small line brake system's continual random malfunctioning, but that these failures created the potential for such great tragedy that such risk to the wrecking crew members was substantially greater than that which is necessary to make conduct negligent, was patently reasonable and justified by the evidence.

The evidence also supported the jury's conclusion that this quasi-criminal conduct was authorized or ratified by the corporation.

Richard Vander Molen testified, as did the other witnesses, that the machinist department, the department in which this corporation reposed primary responsibility for the proper maintenance of this crane, was the only department, other than John Kozar's own superiors, to which John Kozar could turn to service the DK–8 to assure the required standard of safety for operational activity.

Clifford Reed's testimony provided the jury with the basis to have reasonably concluded that this department knew of the malfunctioning problems of the brake system before the accident, and yet not only did the machinists not correct them but they did not even make a serious attempt to do so.

Richard Vander Molen also testified that he and his superior, C. A. Thomas, had the authority to take the DK–8 out of service until it was properly inspected and repaired. He did indicate, however, that this authority was sparingly used because they could not "step overboard" and, presumably, interfere with the responsibilities of another department.

The answers to Interrogatory Number 20,[13] and C. A. Thomas' 1965 letter, evidence that at least C. A. Thomas was aware of the brake system's continual random failure, and of the inadequate methods of inspecting and repairing this system which were practiced.

Moreover, in light of Virgil Bosch's letter of February 16, 1968, the jury, bearing in mind the potential disaster which could result from the brake system's random failure, could even have reasonably inferred that each time railroad equipment had been dropped by the DK–8 wrecker crane, information of such an occurrence and any repairs and inspections which followed was provided to those corporate officials charged with the responsibility of providing the DK–8 crew with safe, reliable equipment.

There was no evidence offered to show that any effort was made to withhold this crane from service so that those methods of inspection and repair would be altered. Certainly this evidence provided a basis for the jury to have reasonably concluded that the decision on how this machine should be inspected could "fairly be said to be truly that of the principal," defendant Chesapeake and Ohio Railway, General Motors Acceptance Corporation v. Froelich, 106 U.S. App.D.C. 357, 273 F.2d 92, 94 (1959).

Furthermore, information as to John Kozar's tragic death and the nature and results of the inspections which immediately followed was passed up the chain of command in those departments of this corporation which directly supervised the machinists in the Grand Rapids division. Even J. F. Finnegan, the supervisor of all machinists in the entire Northern Region of the Chesapeake and Ohio Railway Company, had this detailed information; yet the superficial methods of inspecting and repairing this DK–8 were not changed. During the two and a half months after John Kozar's death that the brake system continued to randomly malfunction, the members of the wrecking crew continued to pass information of the defective nature of the brake system up the proper channels of authority, either by inspection reports, which Richard Vander Molen said go normally to C. A. Thomas, or directly to the machinist department. Yet not until May 8, 1968, was this brake system torn down and then only upon William Ritzenheim's insistence.

In fact, in April 1969, over fourteen months after John Kozar's death and

---

13. See Footnote 10.

over seven months after the instant suit had been started, the small line hand brake was still so defective that it remained essentially inoperable.

From the testimony of the Chesapeake and Ohio employees and Professor Hinkle, and from the exhibits, the jury could reasonably have concluded that through this period of five or more years the hand brake never functioned properly, and this fact was known throughout the defendant's Northern Region, including those officials charged with the responsibility for this suit. Yet the hand brake was still not functioning properly over one year after John Kozar's death.

Furthermore, because of the company's system of communication, the jury could also have concluded that the brake system's defective condition was known to and that the inadequate methods of inspection and repair being practiced on the DK–8, were ratified by top management, from J. F. Finnegan, Richard Vander Molen, Virgil Bosch, and to the machinists who performed the simple, minute repairs and inspections on the DK–8's braking system for a period of upwards of five years, including the time before and after John Kozar's death.

If the defendant's high officers and men had in the early instances of "creeping" performed the high duty imposed upon them by Congress through the Federal Employers' Liability Act, the accumulated condition found on May 8, 1968, could have been discovered and prevented four or five years before John Kozar's death, and if they had followed the same high duty within a very short period of time before John Kozar's death, after they had the latest warning of the "creeping," John Kozar would be alive today.

From these facts and from the entire testimony in the case relevant to the history of the DK–8's brake system during the period in question, the jury had substantial evidence to justify its decision on every essential requirement for punitive damages; wilful, wanton or reckless disregard of civilly imposed obligations, authorization and ratification.[13a]

(b) *Effect of Contributory Negligence.*

■ As was pointed out earlier, the jury determined that John Kozar's conduct was a five per cent cause of his death. The defendant contends this is a defense to punitive damages. This claim is patently frivolous.

During the trial, the court ruled that the deceased's conduct could not be a defense to a finding of punitive damages, unless the deceased had also acted wilfully, wantonly or with reckless disregard for his own safety.

Support for the court's position has near unanimous approval among American jurisdictions and this trend has been recognized by every commentator on this subject that this court has reviewed.

Prosser's discussion of this subject concludes that "all courts" have ruled as this court did.

"The ordinary contributory negligence of the plaintiff is to be set over against the ordinary negligence of the defendant, to bar the action. But where the defendant's conduct is actually intended to inflict harm upon the plaintiff, there is a difference, not merely in degree but in the kind of fault; and the defense never has been extended to such intentional torts. Thus it is no defense to assault and battery. The same is true of that aggravated form of negligence, approaching intent, which has been characterized variously as "wilful," "wanton," or "reckless," as to which all courts have held that ordinary negligence on the part of the plaintiff will not bar recovery. Such conduct differs from negligence not only in degree but in kind, and in the social condemnation attached to it. Many courts have said that in such cases the defendant's conduct is not the "proximate cause" of the harm; but this is

13(a). See Rogers v. Missouri, Pacific R. Co., supra, 352 U.S. at 508, footnote 17, 77 S.Ct. 443 and infra, p. 372, footnote 19.

clearly unsound, for the causal connection is the same as in any ordinary contributory negligence case. It is in reality a rule of comparative fault which is being applied, and the court is refusing to set up the lesser fault against the greater." W. Prosser, The Law of Torts, § 64 at 436 (3rd. ed, 1964).

Similar recognition of this general proposition is found in Harper and James' Treatise:

> "§ 22.6. Willful, wanton, or reckless misconduct. Under the prevailing American rule contributory negligence is no defense to an action for an injury caused by such misconduct though this seems to be doubtful in England. Here again (as in the case of intended consequences) the rule may be explained by the strong natural feeling that faults should be compared, that a serious wrongdoer should not escape liability because of the trivial misstep of his victim. Here again courts justify comparison of faults by pointing out that willful or wanton misconduct is different from negligence in kind, not merely in degree. And here again the courts still apply the all-or-nothing rule; they compare plaintiff's fault with defendant's only to see whether it will be a defense at all, not for the purpose of diminishing damages." 2 F. Harper and F. James, The Law of Torts, § 22.6 at 1213, 1214 (1956).

Extensive collections of cases in support of this court's ruling can be found in 38 Am.Jur. 854, n. 8 (1941); 2 Restatement of Torts 2d § 481, § 482 and § 503; 65 C.J.S. Negligence § 131, p. 751 n. 9 (1950); and in the West Digest System under ☞ Negligence 100.

This review amply supports the court's ruling that John Kozar's slight negligence should not bar the jury's award of punitive damages against the defendant for its reckless disregard of a civil obligation to John Kozar.

(c) *Requirement of Actual Damages.*

Defendant also claims that punitive damages cannot be awarded in this case because there has been no finding of actual damages.

▉ It is undisputed that federal law and not state law controls the disposition of this issue.[14] 45 U.S.C. § 51 et seq. See also Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965).

Though only a few federal cases have actually discussed this issue, it appears that the federal common law differs from that accepted by a majority of the states. In Press Publishing Co. v. Monroe, 73 F. 196 (2nd Cir. 1896), the court stated:

> "Plaintiff in error contends that the court erred in instructing the jury that it might award exemplary damages. That in certain classes of cases juries are authorized to give punitive or exemplary damages to punish a wrongdoer and to deter others from the commission of a like wrong is well-settled law in the federal courts and in the courts of this state. Day v. Woodworth, 13 How. [363] 370; [14 L.Ed. 181; Milwaukee & St. Paul] Railroad [Railway] Co. v. Arms, 91 U.S. 489 [23 L.Ed. 374]; Voltz v. Blackmar, 64 N.Y. 440. In such cases exemplary damages may be given in addition to what may be proved to be the actual money loss of the plaintiff. It is contended, however, that when no actual damages are proved, exemplary damages should not be allowed. In support of this proposition three cases are cited * * *. They are, however, plainly at variance with the theory upon which exemplary damages are awarded in the federal courts, namely, as something additional to, and in no wise de-

---

14. The rule of law recognized by state courts, requires that actual or compensatory damages first be awarded before punitive damages can be recovered. Even under such a rule, the rule that the defendant argues is controlling, Ollier v. Lake Central Airlines, Inc., 423 F.2d 554 (6th Cir. 1970), plaintiff has sustained her burden. The jury awarded $500 for the injuries John Kozar suffered before his death.

pendent upon, the actual pecuniary loss of the plaintiff, being frequently given in actions 'where the wrong done to the plaintiff is incapable of being measured by a money standard.' Day v. Woodworth, supra; Wilson v. Vaughan, 23 Fed. 229. There is room for argument against the allowance of exemplary damages at all as anomalous and illogical. Some courts have held that it is unfair to allow the plaintiff to recover not only all the loss he has actually sustained, but also the fine which society imposes on the offender to protect its peculiar interests. But if it be once conceded that such additional damages may be assessed against the wrongdoer, and, when assessed, may be taken by the plaintiff, —and such is the settled law of the federal courts,—*there is neither sense nor reason in the proposition that such additional damages may be recovered by a plaintiff who is able to show that he has lost $10, and may not be recovered by some other plaintiff who has sustained, it may be, far greater injury, but is unable to prove that he is poorer in pocket by the wrongdoing of defendant.*" (Emphasis supplied.) 73 F. at 201.

Similarly, in Wardman-Justice Motors, Inc. v. Petrie, 59 App.D.C. 262, 39 F.2d 512 (1930), the court recognized that the rule which prevails in many states and by which "actual damages must be established as a basis for the assessment of punitive damages * * * is not the federal rule nor the rule applied in this district." 39 F.2d at 516. This case was an action for malicious trespass, based upon the wrongful taking of property which had been recovered in a replevin action. Since nominal damages had already been awarded in that replevin action, the defendant argued that punitive damages were not presently recoverable because actual and nominal damages could not again be awarded. The court rejected this argument.

"This contention cannot on any theory of the law or justice be upheld. If nominal damage were held to be essential under the federal rule, as a basis for punitive damages, nominal damage has been found in this case; *but under the federal rule, and the rule in this district, proof of actual loss is sufficient to sustain a judgment for punitive damages, * * *.*" (Emphasis supplied.) 39 F.2d at 516.

In Scalise v. National Utility Service, Inc., 120 F.2d 938 (5th Cir. 1941), the court reached the same result:

"In Florida as in the federal courts, the giving of punitive damages is not dependent upon, nor must it bear any relation to, the allowance of actual damages. *It is sufficient that there has been a deliberately wrongful act for which the plaintiff has a right of action and that the circumstances are such as to authorize the exaction of smart money.*" (Emphasis supplied.) 120 F.2d at 941.

The most recent review of this question was made by the Third Circuit in Basista v. Weir, supra. This case dealt with the Civil Rights Act, 42 U.S.C. §§ 1983, 1988, and the possible application of punitive damages. It was asserted that there can be no punitive damages where actual damages have not been recovered, but the court by Chief Judge Briggs stated:

"As a matter of federal common law it is not necessary to allege nominal damages and *nominal damages are proved by proof of deprivation of a right to which the plaintiff was entitled.*" (Emphasis supplied.) 340 F. 2d at 87.

In the last analysis these cases determined that the law of remedies does not set arbitrary limits to that policy upon which the doctrine of punitive damages is premised. The jurisprudential justification for this ruling was best expressed by Mr. Justice Marshall in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 162, 163, 2 L.Ed. 60.

"2. This brings us to the second inquiry; which is: If he has a right, and that right has been violated, do

the laws of his country afford him a remedy?

"*The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government is to afford that protection.* In Great Britain, the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.

"In the 3d vol. of his Commentaries (p. 23), Blackstone states two cases in which a remedy is afforded by mere operation of law. '*In all other cases,*' he says, '*it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded.*' And afterwards (p. 109, of the same vol.), he says, '*I am next to consider such injuries as are cognisable by the courts of the common law. And herein I shall, for the present, only remark, that all possible injuries whatsoever, that did not fall within the exclusive cognisance of either the ecclesiastical, military or maritime tribunals, are, for that very reason, within the cognisance of the common-law courts of justice; for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.*'

"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case."

In Moragne v. States Marine Lines, Inc., supra, the court in its discussion of the extension to Admiralty of the common law rule that the relatives of a deceased individual could not sue for his wrongful death, restated the focus of the law of remedies in language strikingly applicable to the instant question:

"One would expect, upon an inquiry into the sources of the common-law rule, to find a clear and compelling justification for what seems a striking departure from the result dictated by elementary principles in the law of remedies. *Where existing law imposes a primary duty, violations of which are compensable if they cause injury, nothing in ordinary notions of justice suggests that a violation should be nonactionable simply because it was serious enough to cause death. On the contrary, that rule has been criticized ever since its inception, and described in such terms as 'barbarous.'* E. g., Osborn v. Gillett, L. R. 8 Ex. 88, 94 (1873) (Lord Bramwell, dissenting); F. Pollock, Law of Torts 55 (Landon ed. 1951); 3 W. Holdsworth, History of English Law 676–677 (3d ed. 1927). *Because the primary duty already exists, the decision whether to allow recovery for violations causing death is entirely a remedial matter.* It is true that the harms to be assuaged are not identical in the two cases: in the case of mere injury, the person physically harmed is made whole for his harm, *while in the case of death, those closest to him—usually spouse and children—seek to recover for their total loss of one on whom they depended.* This difference, however, even when coupled with the practical difficulties of defining the class of beneficiaries who may recover for death, does not seem to account for the law's refusal to recognize a wrongful killing as an actionable tort. One expects, therefore, to find a persuasive, independant justification for this apparent legal anomaly." (Emphasis supplied.) 398 U.S. at 381, 382, 90 S.Ct. at 1778.

See also, Texas & N. O. Ry. Co. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 569, 570, 50 S.Ct. 427, 74 L.Ed. 1034 (1930).

■ These cases, then, in concert provide a rule applicable to actions in

tort for damages arising from the defendant's wrongful acts, a rule vitally concerned with the actual promotion of the policy underlying punitive damages. Recovery of punitive damages does not depend upon whether John Kozar was killed instantly and without compensatory damages, but depends upon some injury or actual loss caused by a reckless disregard for a civil obligation.[15]

Accordingly, when federal law controls, as it does in the instant suit, actual or compensatory damages need not be recovered before punitive damages can be assessed. John Kozar's injury, then, as recognized by the jury, was a sufficient "injury" or "actual loss" as to be the basis for this claim for punitive damages.[16]

## PRE-IMPACT FRIGHT

Originally, Count II of plaintiff's complaint sought $10,000 in damages for the mental anguish and fright of impending death which Mr. Kozar experienced as he attemped to escape from beneath the falling boxcar. Later amended, Count II also sought damages for pain and suffering John Kozar experienced after the car struck him.

The jury concluded that the deceased did not suffer pain or suffering subsequent to being struck by the falling boxcar.

The jury, however, did award $500 in damages for the emotional fright and suffering which John Kozar endured between the time he first realized the boxcar was falling and the time when he was struck and killed. Defendant objects to this award for it feels that under the Federal Employers' Liability Act, preimpact fright is not compensable. The defendant also argues that under the facts of this case the jury's award was not supported by the evidence.

As stated above, Count II claims damages for mental anguish suffered by Mr. Kozar before the boxcar actually touched him. The Federal Employers' Liability Act cases cited by the plaintiff, however, do not stand for that exact proposition. Each of those cases permitted recovery for mental anguish and suffering, after some initial shock, blow or physical harm had occurred to the employee's body.

Wiggins v. Lane & Co., 298 F.Supp. 194 (E.D.La., 1969), is the first case cited by the plaintiff as authority for the position that pre-impact fright is compensable. However, that court specifi-

---

15. Certainly John Kozar sustained an injury or actual loss when he was killed. Similarly, in light of the Federal Employers' Liability Act, it would seem that John Kozar was deprived of a right just as the plaintiff was in Basista v. Weir, supra, but here it was his right as a railroad employee to be free from injuries or death caused by the wrongful conduct of his employer.

This court is also aware of the discussion in Moragne v. States Marine Lines, Inc., supra, wherein the court approvingly discussed the English House of Lord's decision in Rose v. Ford (1937) A.C. 826, a case that "emasculated" the previous British ruling that the dependents of a deceased maritime worker could not bring an action for his wrongful death.

"Lord Atkin concluded that, while the doctrine barred recognition of a claim in the dependents for the wrongful death of a person, *it did not bar recognition of a common-law claim in the decedent himself for 'loss of expectation of life'*

—*a claim that vested in the person in the interval between the injury and death, and thereupon passed, with the aid of a survival statute, to the representative of his estate.* He expressed no doubt that the claim was 'capable of being estimated in terms of money: and that the calculation should be made' *Id.*, at 834. Thus, except that the measure of damages might differ, the representative was allowed to recover on behalf of the heirs what they could not recover in their own names." 398 U.S. at 389, 90 S.Ct. at 1781.

16. In light of Moragne v. States Marine Lines, Inc., supra, it is patently conceivable that the federal common law of damages would now permit a petitioner under a federal wrongful death statute to recover punitive damages whenever the jury finds that the conduct which provided the basis for such a cause of action is in reckless disregard of the defendant's civil obligations to the petitioner.

cally distinguished its facts from the facts before this court.

"Smith v. United States, D.C.Tex. 1953, 121 F.Supp. 778, aff'd as to other issues, 5 Cir., 1955, 220 F.2d 548, appears to reach a contrary conclusion. The decedent fell while climbing a 30 foot ladder without a prior injury. In *Smith*, however, there was no conscious physical suffering during the fall and the court, acting as trier of fact, found that the amount of damages for the mental suffering of falling itself would be speculative." 298 F.Supp. at 197.

An examination of other Federal Employers' Liability Act cases cited by the plaintiff discloses that each involved some physical impact before the mental fright and suffering of the claimant. The only Federal Employers' Liability Act case which has specifically dealt with the present issue is Smith v. United States, discussed above by the Wiggins court.

There plaintiff was climbing a rope ladder, when the ends became untied. The ladder and the seaman fell thirty feet to the dock below and then into the water. The seaman either died upon impact with the dock or within seconds thereafter by drowning. The court concluded:

"The record shows that Smith is dead as a result of his fall with the ladder. But it would be a mere guess to say when he died, or whether his death was caused from striking the dock or drowning or both. If the time of his death was known and shown, *there would I take it be both mental and physical suffering by him from the time he began to fall until his death.* But as the record stands, *the only certain period of mental and physical suffering is from the time he began to fall until he struck the dock,* and the amount of damages, if any, recoverable therefor would be a mere guess. I do not think Libellant, *under this record,* is entitled to recover therefor." (Emphasis supplied.) 121 F.Supp. at 784, 785.

Plaintiff contends that this decision was not decided as a matter of law, but was decided on the facts of that particular case. Thus, the plaintiff argues that the trier of fact in this case should be given the opportunity to reach its own decision on the facts relating to John Kozar's death. The emphasized portions of the Smith opinion support this interpretation. Similarly, the Wiggins opinion had dicta which also supports the plaintiff's contention:

"If a seaman fell from the mast into the sea, was rescued a few seconds later after almost drowning, was given artificial respiration, and brought back to consciousness, *it would appear certain that he could recover for the fright suffered in the moments when he thought he was falling to his death.* The survivorship statute draws no distinction that would eliminate the cause of action because the decedent's suffering was in fact brief." (Emphasis supplied.) 298 F.Supp. 196.

After a review of the statute, this court is unable to find any language which would preclude Mr. Kozar from recovery for pre-impact fright. Both Section 51 and Section 59 permit recovery "in damages to any person suffering *injury * * *.*" (Emphasis added.) Court decisions have concluded that mental agony and emotional fright are one type of injury encompassed by these sections. Civil v. Waterman S.S. Corp., 217 F.2d 94 (2nd Cir. 1954); Southern Pacific Co. v. Heavingham, 236 F.2d 406 (9th Cir. 1956). Cf. Ford v. Monroe, 20 Wend. 210 (N.Y.1838); United States Steel Corp. v. Lamp, 436 F.2d 1256 (6th Cir. 1970):

In Petition of Marina Mercante Nicaraguense, S. A., 248 F.Supp. 15 (S.D.N.Y.1965), affirmed as to other issues, 364 F.2d 118 (2nd Cir. 1966), cert. denied Marina Mercante Nicaraguense, S. A. v. McAllister Bros., Inc., 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544, rehearing denied 386 U.S. 929, 87 S.Ct. 851, 17 L.Ed. 2d 803 the court stated:

"The petitioners also oppose any allowance for conscious pain and suffer-

ing: It is true that the tug went under in a matter of two or three minutes and that death by drowning came quickly. But death was not instantaneous; each decedent, suddenly confronted with fast moving and alarming events beyond his control, struggled to save himself. Fargo and Salvesen were last seen by the surviving crew members on the deck of the tug with the water sweeping over her as she was going down. Their bodies were later recovered from the channel. Evans was found by the diver on the tug's deck when she lay on the channel floor, with his left leg jammed under a rail and his body, head down, over the side of the tug. It is clear that he and the others drowned only after a desperate struggle. Each went through a frightful, terrifying and painful experience—and while their suffering was short-lived, it was intensive, excruciating and agonizing. In the instance of each decedent the Court is of the view that an award for conscious pain and suffering is warranted in the sum of $1,500." 248 F.Supp. at 28.

This court concludes that when defined in terms of a rule of law, Mr. Kozar's pre-impact fright is no more speculative than the fright of a drowning seaman. This conclusion is compelled by the mandate of Congress, as interpreted by the teachings of the Supreme Court in Rogers v. Missouri Pacific R. Co., supra, that this act is not to be "narrowly and niggardly" construed, and by the law of remedies. No legal distinction exists between these "injuries." If such a distinction does exist, it is factual in nature and one for the jury to make.

Since the jury did make an award for this period of emotional injury, this court must accept the facts most favorable to the plaintiff's claim when determining whether there is sufficient evidence to support the jury verdict.

The Supreme Court has a special solicitude to insure that all factual issues in a Federal Employers' Liability Act case are resolved by the jury:

"*Cognizant of the duty to effectuate the intention of the Congress to secure the right to a jury determination, this Court is vigilant to exercise its power of review in any case where it appears that the litigants have been improperly deprived of that determination.* Some say the Act has shortcomings and would prefer a workmen's compensation scheme. The fact that Congress has not seen fit to substitute that scheme *cannot relieve this Court of its obligation to effectuate the present congressional intention by granting certiorari to correct instances of improper administration of the Act and to prevent its erosion by narrow and niggardly construction.*" (Emphasis supplied.) Rogers v. Missouri Pacific R. Co., 352 U.S. 500 at 509, 77 S.Ct. 443 at 450, 1 L.Ed.2d 493 (1957).

The testimony evidences that John Kozar was aware of the falling boxcar, that he was aware he was in or near a position of danger and that he attempted to run from beneath the boxcar in a bent over position so as to avoid being struck until the last possible moment.

The jury certainly could have reasonably determined from this evidence that John Kozar sustained emotional injuries caused by a terrifying realization that he was about to die. Furthermore, in light of the testimony which evidenced that John Kozar took his family obligations seriously, the jury also could have reasonably inferred that John Kozar suffered horrendous emotional injuries due to an immediate appreciation of the tragedy that would befall his family if he were killed.

## PROCEDURAL ISSUES

(a) *Defendant's request for daily copy.*

On the afternoon of March 4, 1970, three days before trial, the court became aware that the defendant railroad had

arranged for extra court reporters to provide it with a daily transcript of the proceedings in this case. Further inquiry confirmed defendant's intent, although no such request had been made either to the court or the official court reporter.

28 U.S.C.A. § 753 provides in part:

"(a) Each district court of the United States, * * * shall appoint one or more court reporters.

The qualifications of such reporters shall be determined by standards formulated by the Judicial Conference. Each reporter shall take an oath faithfully to perform the duties of his office.

\* \* \* \* \* \*

(b) No transcripts of the proceedings of the court shall be considered as official except those made from the records taken by the reporter.

\* \* \* \* \* \*

(c) The reporters shall be subject to the supervision of the appointing court and the Judicial Conference in the performance of their duties, including dealings with parties requesting transcripts."

 This section vests supervisory control over the court reporter in the district judge. Implicit in such control, and consistent with § 753(b) above, is the sole authority and responsibility of the district judge to arrange for substitute or additional reporters. The practice in this court is for a party desiring daily copy to contact both the court and the reporter well in advance of trial and make a request for extra personnel. If the court approves, the official reporter arranges, subject to the court's consent, for the necessary additional reporters. This procedure has numerous benefits. It allows the reporter to make any appropriate adjustments in an extremely busy schedule and also to participate, if so desiring, in the added compensation accompanying the furnishing of daily copy. Most importantly, it provides the court an opportunity to pass upon the qualifications of

the extra reporters, and the substance of the arrangement made for their participation. To preserve control and avoid any conflict of interest, it is important that reporters are hired by the court and not by the parties. The statute requires nothing less.

Immediate telephone contact with defendant's local counsel, later in the afternoon of March 4, produced apologies and pleas of ignorance of the above procedure. Counsel informed the court that efforts to obtain a daily transcript began weeks before trial was scheduled. Final arrangements for the employment of a firm of private reporters had already been made. Counsel admitted that at no time did he contact the court or the official court reporter concerning his plans. Counsel then made a formal request, via telephone, for daily copy, and a hearing was scheduled for the following day.

 Defendant requested either that the official reporter be allowed to arrange for a daily transcript or that the firm already retained be permitted to proceed. Defendant agreed to furnish plaintiff with a copy without cost. The first request was denied because there simply was not time to complete such arrangements. The alternative request was also denied for reasons set forth below.

As mentioned above, defendant did not proceed in this matter according to the procedure and policy established by the court. To allow defendant to continue with its independent arrangements for a daily transcript would entail the sacrifice of the judicial responsibility imposed by 28 U.S.C.A. § 753. This statute and the procedure followed by the court are not mere formalities; they involve values that merit protection. Thus the failure of defendant to notify this court or its reporter of its plans for daily copy, except upon direct inquiry three days before trial, provides ample basis, in the exercise of sound discretion, for denying their request for a daily transcript.

Defendant's unilateral efforts also violated the spirit of the court's pretrial order, entered pursuant to Rule 16. Matters of procedural innovation such as daily copy are to be brought before the court and the opposing parties no later than the pretrial conference. This is the appropriate time and place to allow all concerned to comment upon, criticize, object to, or endorse procedural suggestions. Opposing parties and the court should not be allowed to proceed to trial without knowledge of a party's plan for daily copy. The court is not holding here that the failure to breach such matters at pretrial automatically forecloses their subsequent consideration; it is merely stating the fact that such failure may, in some circumstances, be considered in precluding a tardy request of this nature.

Finally, on the facts of this case, the court's ruling above would have been justified solely on the basis of the potential danger of abuse of daily copy in this type of action. Experience with Federal Employers' Liability Act cases has carried with it many lessons. One is that the bulk of testimony usually comes from employees of the defendant, thus rendering advisable the sequestration of witnesses in order to preserve intact their individual recollection of facts and events. Another, more painful, reality is that these witnesses—a railroad's own employees—often appear fearful to testify. This obvious anxiety is not merely the product of a shy or nervous personality; it is the kind of fear that comes from the belief that one's words may affect job, financial security, family and future. In a recent case involving the present defendant, Sleeman v. Chesapeake & O. R. Co., 290 F.Supp. 817 (W.D.Mich.1968), the court had the painful experience of observing such a witness. The record only partially reflects the apprehension clearly visible at the time:

"A. I probably said something along that line. However, at the time that this testimony or this statement was given to Mr. Ten Elshof, there was what you might say mixed feelings toward this whole thing. That is to say—

"Q. I am not asking you—

"THE COURT: Let me hear the answer.

"MR. STRAWHECKER: I am not concerned about mixed feelings.

"THE COURT: Go ahead and say what you were going to say.

"A. That is to say, much feeling to get involved or not to get involved. I felt because I was then there I had to say something. I certainly couldn't deny the fact that I was there. But who to say anything to, or what to say, shortly before or perhaps the same day, I can't recall exactly. You must understand that when I gave the statement to Mr. Ten Elshof, this was after by some time I had given a statement to Mr. McKee concerning the accident. And then all of a sudden the railroad was drawn into the matter and Mr. Gwenn (phonetic), who was at that time resident train master was more than a little concerned and excited about my giving a statement to anyone other than the railroad without giving a statement to the railroad or a copy of the statement to the railroad, or at least consulting the railroad prior to giving a statement to anyone. And I felt that I was in hot water, to be blunt about the whole thing.

And being a man of—Well, let's put it this way: I am concerned more for my family and my responsibilities and my job to the point where, like I say, I didn't know whether to say yea or nay, one way or the other. But he was asking me; and with this in the back of my mind, I am giving this man a statement and not really thinking about whether or not it would ever be brought back and used at all. So I guess that's about all I have to say along that line, is that I was under some stress.

"THE COURT: That's one of the problems in cases of this kind where employees of a large corporation are involved.

"A. *It was brought out to me that the railroad was my bread and butter.*

\* \* \* \* \* \*

"Q. Do you claim that you told those conditions to Mr. Ten Elshof at the time of this statement?

"A. You mean the stress that I felt?

"Q. That is right.

"A. I didn't tell him anything like that.

"Q. Of course not.

"A. Because as far as I'm concerned, Mr. Ten Elshof is an official of the railroad.

\* \* \* \* \* \*

"A. If I may add, at the particular time that this thing was all going on, there was no economic pressure put on itself. *The seed was planted, you see, of the possibilities. I remember very clearly Mr. Gwenn (phonetic), himself asking if I didn't realize that I could lose my job over something like this inasmuch as it was against the rules of the railroad. And I believe— I don't believe specifically, but I believe he gave a certain rule by number.*

\* \* \* \* \* \*

"Q. Uh-huh. Did they reprimand you for having given a statement?

"A. Mr. Ten Elshof didn't actually reprimand in the manner one usually thinks of a reprimand. However, Mr. Gwenn was—acted as though he was rather angry. But Mr. Ten Elshof spoke to me in—it was a little excited, but I didn't feel he was trying to reprimand me; but it was just sort of a, 'Gee, you should have known things like that,' you know.

"Q. Were they upset with you?

"A. Yes, very much so.

"Q. Was there anything said about losing your job?

"A. *Only what Mr. Gwenn said about, you know, you could lose your job because of this—because it is a violation of the rules.* And he proceeded to point out that if it did come to court, between the two attorneys they would endeavor to make a horse's rear end out of me, and this sort of thing. That part of it doesn't bother me. I do a pretty good job sometimes of doing this myself. But the only thing that really made me worry is the fact of the reprisals, perhaps, I'd have to face.

"Q. Was Merril Smith (another employee) also called in at the same time you were (to give a statement)?

"A. No, but we talked about it afterwards. And I—from what I could recall from what he said to me, that he had been—

\* \* \* \* \* \*

*well, he explained to me that he had been more or less singed, too, but I don't know by whom. But that's the frightening thing, you know. The claim agent, the railroad and yourself, you have all the information, and we don't know anything, you see. You don't know whether to jump, you know, in an effort to protect yourself."* (Emphasis supplied.)

As mentioned above, the court takes special care to insure that each Federal Employers' Liability Act witness presents his testimony as accurately as possible and unencumbered by extraneous influences. It is therefore particularly alarming to encounter a witness whose demeanor bears the earmarks of possible intimidation. As Hansen's testimony in Sleeman graphically indicates, railroad employees are subject to considerable pressure if called to give testimony against their employer. This pressure need not be the result of direct threats or arm-twisting; it is not necessarily the object of deliberate railroad policy. But whether by design or accident, the fact remains that these working men, through numerous contacts with supervisors and claim agents during the discovery process, often believe that a wrong step—defined by railroad rules (real or apparent) and interpreted by railroad officials—may result in sanctions, and that the wrong testimony—

potentially costing the railroad large amounts of money—might arouse the displeasure of those in control of their livelihood.[17] The tremendous power of a corporation like the Chesapeake and Ohio Railroad, coupled with its aggressive efforts to defeat the claims of those injured by its activities—even when the victims are their most valuable employees —can overawe and even cower those individuals upon whom an opposing party must rely to substantiate his claim. Defendant's attempt to minimize these pressures by claiming inability, in the face of railroad unions, to sanction its employees is not convincing. No one in the position of these men can be expected to take a position opposing their employer without considerable anxiety. This is a fact of human nature which defendant cannot so cavalierly ignore.

▮▮▮▮ It is with these factors constantly in mind that the court approaches Federal Employers' Liability Act litigation. Sequestration of witnesses is one method of preserving the integrity of their testimony. The prospect that daily copy might be used, even unintentionally, in a manner that has the effect of subverting this policy is sufficient justification, in the exercise of a sound discretion faithful to the mandate of Rule 1, to deny its use. Railroad representatives, armed with a daily transcript and closeted with prospective employee-witnesses, could potentially destroy the benefits of sequestration, while possibly adding to the accumulation of subtle but pervasive pressure which is often reflected in the testimony of railroad employees. Such a situation is at odds with the "just * * * determination of every action" contemplated by the federal rules, and must not be encouraged.

In the instant case, during the hearing on defendant's request for daily copy plaintiff's counsel indicated that some of the wrecker crew members "were concerned about potential problems" of this nature, and that he could discern no factual basis for such feeling other than that they were employees of the railroad.[18] In light of the court's experience

17. The authors of the Act realized the danger of direct coercion by railroad agents against its employees and thus included 45 U.S.C.A. § 60 in the statute:

Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction thereof, be punished by a fine of not more than $1,000 or imprisoned for not more than one year, or by both such fine and imprisonment, for each offense: *Provided,* That nothing herein contained shall be construed to void any contract, rule, or regulation with respect to any information contained in the files of the carrier, or other privileged or confidential reports.

Obviously, any direct attempt by the Chesapeake and Ohio Railroad to prevent employees from giving statements or conferring with opposing attorneys would be in violation of this section. Such a violation of federally created rights can be remedied not only through the criminal process but in an action for equitable or other relief. It has been clear since Marbury v. Madison, supra, that the logic of the common law of remedies and the equitable power of the court combine to allow maximum flexibility in adjusting the quality of remedy to the nature of the right involved. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); A class action for an injunction or possibly for damages will be given the closest attention in such a situation.

18. Confirmation of some concern on the part of witnesses in this case was vividly provided by the testimony of William J. Ritzenheim, a Chesapeake and Ohio employee for nineteen years, and present wreckmaster of the Grand Rapids crew.

in Sleeman and other Federal Employers' Liability Act cases, this concern cannot be taken lightly.

The court is aware that daily copy can be of value in shortening a trial and improving the quality of testimony in complex or protracted matters. However, its utility is somewhat marginal in Federal Employers' Liability Act cases. Congress intended that litigation under the Act be simple, direct and expeditious. In this context daily copy appears only as an expensive frill. Therefore, the questionable need for a daily transcript is usually more than offset by the problems which may accompany its use in this type of case. The court believes that this is the situation here.

If other grounds did not already exist, the policy factors discussed above would amply justify denial of defendant's request.

(b) *Defendant's request for a continuance.*

■■■ On Friday, March 13, 1970, the court and all participants in the trial, including the jury, were deeply saddened by the death of defendant's local counsel. This unfortunate event occurred after the jury verdict on liability and after commencement of proof on damages, but before the latter issue was submitted to the jury.

Shortly after word of his death was received, the court and the attorneys agreed that a continuance would be necessary. The court, however, was anxious to conclude the trial as soon as possible, and reasoned that a long delay would have seriously disrupted its already crowded calendar. More importantly, a long delay might well have substantially prejudiced the plaintiff's case. She had completed her proofs, and defendant's local trial counsel had informed the court

on the afternoon before his death that defendant required approximately half a day to present its case; and that it would call two, or possibly three witnesses. Accordingly, the court requested that the parties try to be prepared to resume the trial six days later, on Thursday, March 19, 1970. The court offered to assist the defendant's general trial counsel in any way possible and requested that the plaintiff's attorneys provide any requested assistance. If the parties were unable to prepare by the 19th, they were to notify the court and appropriate arrangements would be made.

Defendant now claims that it was error not to grant co-counsel's request to continue the case until March 23, "but rather to force defendant on for trial on March 19." Defendant's general trial counsel urges that the continuance provided insufficient time for him to prepare for the remainder of defendant's proofs on damages.

This allegation is without merit. As noted above, on March 13 the court requested the parties to inform it of any problems with the March 19th date. Instead of requesting a further delay, one of the defendant's associate local counsel notified the court on March 15, that it would be prepared to resume the case as scheduled on March 19. Similarly, the defendant's attorneys in a letter dated March 17 notified the plaintiff's attorneys that they "anticipate the trial will begin again on Thursday morning, March 19, 1970, at 9:30."

There is therefore nothing in the record to indicate that this defendant was "forced" to trial on March 19.

The record also offers no support for counsel's claim of prejudice to his trial preparation. Mr. Strawhecker was the Chesapeake and Ohio Railway's local counsel. Mr. Straub is the railroad's

---

As the court commented, in the absence of the jury, after his testimony: "I watched this witness all through his testimony. This witness was a frightened witness. Sometimes it took 10 to 15 seconds just to answer 'yes.' He was tugging and pulling at his handkerchief, wiping the sweat from his brow and hands. And I felt terribly sorry for that witness. He is fearful right now. And he was terribly fearful on that stand. And he is a man who is a responsible man, I am sure. A hard-working man, I am sure."

chief trial attorney for the Michigan area. He had signed the defendant's answer in the case and was thoroughly familiar with the details of this case from the day it was filed. He had complete control of the broader aspects of the litigation, such as general trial and pretrial strategy, and settlement negotiations. This is perhaps typical for all cases under his immediate supervision and probably, by itself, would not sufficiently prepare him for the rigorous process of actually conducting the trial.

However, in this case he actually participated, as co-counsel, in every proceeding before this court. Though he was not present when the jury was drawn, he had to be consulted before defendant would consent to certain proposals made by the court at that time. He sat next to defendant's local trial counsel throughout the trial, taking constant notes and engaging in numerous conferences with his local counsel. He conducted cross-examinations and, at the end of the liability aspect of the case, presented defendant's final argument to the jury. Throughout all of this he gave every indication that he was well prepared and thoroughly familiar with his case. The court had the right to assume that he was, as co-counsel, as knowledgable as defendant's local trial counsel.

The court relies on co-counsel to continue with a trial if an attorney conducting a part of the proceedings is unable to attend. For trial lawyers such practice is axiomatic. Therefore, the court could expect defendant's general trial counsel and another of defendant's local associate counsel, who had participated in the case from the beginning, to be able to proceed forthwith with the remaining half day of defendant's proof. There was nothing to indicate that they could not ably do so. In this light, the six day continuance was more than adequate. Assertions to the contrary stretch credulity.

To have granted the defendant additional time past the March 19 date would have, in the context outlined above, amounted to unwarranted delay. In this particular action, the court had already spent valuable time and effort dealing with matters that should never arise in Federal Employers' Liability Act cases. Some of these unnecessary problems—all of which caused expenditure of time and effort toward resolution—can be credited to this defendant.[19] When a

---

19. "Federal Employers' Liability Act litigation is intended to be simple and direct. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.[16] The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial,[17] from which the jury may with reason make that inference."

"16. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610."

"17. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence. The Robert Edwards, 6 Wheat. 187, 190, 5 L.Ed. 238."
Rogers v. Missouri Pacific R. Co. supra, 352 U.S. at 507, 508, 77 S.Ct. at 449.

Obvious as this may be, the Chesapeake and Ohio Railroad has habitually loaded its cases with legal issues which are clearly inapposite and serve only to complicate the pretrial process and burden this court and opposing parties. For example, in the present case defendant urged that the doctrine of res ipsa loquitur did not apply to Federal Employers' Act litigation. A discussion of this occupied a good portion of a pretrial conference. The United States Supreme Court, in a well known case in this area—Jesionowski v. Boston & Maine R. R., 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416 (1947)—has taken the opposite position.
Normally one would not expect such issues to be tendered by counsel as experienced in Federal Employers' Liability Act matters and as familiar with Federal Employers' Liability Act law as was defendant's counsel in this case.
It should be noted that when court reconvened on March 19, the defendant was not able to proceed, having scheduled its witnesses for the following day. This

party who is already responsible for unneeded complication of a Federal Employers' Liability Act case offers a request that would further lengthen the trial, the court will understandably give such request the most detailed scrutiny. Defendant's wish to postpone conclusion of this matter until March 23 simply did not pass muster and was properly denied.

(c) *Exclusion of defendant's expert witness.*

Defendant objects to the court's ruling that its mechanical engineering expert could not testify since he was not listed at the pretrial. The court had previously granted plaintiff's request to let two lay witnesses testify, even though they too were not listed at the pretrial.

A Rule 16 pretrial order was entered in this case on March 11, 1969. It required, inter alia, that by May 26, 1969, "[t]he parties shall disclose the identity and location of persons who to their knowledge have knowledge of relevant facts. Such disclosure of identity shall include expert witnesses." This order also stated that "[f]ailure to comply with this order may result in the imposition of sanctions."

This court has long considered pretrial conferences, ordered pursuant to Rule 16, to be an important step in trial preparation. These conferences result in clarification of disputed issues of fact and law, and also help the parties to solve all pretrial preparation.

Besides requiring the parties to identify witnesses, the court also requires that exhibits be marked, that objections to the exhibits of the opposite party be put on the record and that discussions be held on any other matters relating to the ultimate disposition of the case. The whole tenor of these conferences, which are required by this court in every civil case, is to help achieve the mandate of Rule 1.

Open and frank discussions of all aspects of a case greatly increase the likelihood of a "just, speedy and inexpensive determination of every action."

was somewhat surprising in view of defendant's local trial counsel assurance on March 12 that the Chesapeake and Ohio's witnesses were ready and would require half a day of court time, and in view of the six-day continuance of the trial.

Defendant informed the court that one witness was ill and another, Mr. Thomas C. Smith, was unprepared. The court had the latter witness produced, put him under oath, and determined after inquiry that he was in fact ready to testify with the exception of one simple calculation. His testimony on the afternoon of the 19th revealed no lack of preparation.

Mr. Richard VanderMolen, John Kozar's immediate superior, was counsel's sick witness. Although not listed in sworn answers to interrogatories or in response to the court's pretrial order as being at the accident scene when Mr. Kozar was killed, defendant produced him for testimony to this effect at this late stage of the proceedings. When Mr. VanderMolen testified on the following day, March 20, he showed no signs whatever of recent illness.

Defendant's general trial counsel, upon continuing to present defendant's case, wished to introduce material which the court ruled was prohibited by the collateral source doctrine. Eichel v. New York Central R. R. Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963). Despite this, he persisted in attempting to place before the jury data which was clearly prohibited by this ruling. Regardless of the merits of the court's decision in this regard, his repeated efforts were in violation of the court's decision and should not have occurred.

As noted at the beginning of this opinion, defendant's motion for a new trial contained over seventy allegations of prejudicial error, many of which were repetitious and some of which were frivolous. As stated by Judge O'Sullivan, referring to a similar situation in United States v. West Coast News Co., 357 F.2d 855, 862 (6th Cir. 1966), "[s]uch inundation of a trial judge, with the obvious hope that the created confusion will lead him to error, is questionable practice. United States v. Olweiss, 138 F.2d 798, 800 (CA2, 1943); Bateman v. United States, 212 F.2d 61, 69 (CA9, 1954)."

This resulted in further delay. At best, it shows a disregard for the court's time and a lack of concern about the numerous days already spent in litigation by Mrs. Kozar and her children.

■ Sanctions for violation of the pretrial order have been imposed by this court. Such sanctions include denial of use of exhibits not properly marked or of witnesses not disclosed to the parties and the court. Leach v. Chesapeake & O. Ry. Co., 35 F.R.D. 9 (W.D.Mich. 1964).[20]

■ The court's pretrial order of March 11, 1969, also provided that "[r]elief from any provision of this Order shall be had only upon a showing of undue hardship and for good cause." This provision has also been liberally construed by this court, with the hope of eliminating "manifest injustice" and thereby promoting the mandate of Rule 1 and the intent and teaching of Rule 83. If the opposite party has not been prejudiced by the delay, relief has been customarily granted to any party who has shown a good faith effort to bring before the court at the earliest possible time any questions or problems ordinarily handled at pretrial. Thompson v. Calmar Steamship Corporation, 331 F.2d 657 (3rd Cir. 1964); Adickes v. S. H. Kress & Co., 409 F.2d 121 (2nd Cir. 1968); Case v. Abrams, 352 F.2d 193 (10th Cir. 1965); Clark v. Pennsylvania R. R. Co., 328 F.2d 591 (2nd Cir. 1964).

At the pretrial conference of October 16, 1969, both parties submitted lists of those persons whom they believed might have knowledge of relevant facts, in accordance with the pretrial order. The plaintiff's list contained twenty names and the defendant's list contained sixty-one names. Defendant submitted a revised list containing only the names of prospective witnesses. This list contained forty-three names. Witnesses Reed, Boruta and Lee were not listed on any one of these three lists.

At this pretrial conference the court denied defendant's motion to take the deposition or seek other discovery of the conclusions and work product of plaintiff's two mechanical engineering experts, only one of which eventually testified at trial.

The defendant wanted to depose the experts in order to know if either had concluded "that there was a defect in the design of the crane which the Railway Company bought in good faith."

Rule 26(b) controls the disposition of this motion. Since the case authority has developed a number of conflicting trends, this court, pursuant to Rule 83, relied upon those precedents accepted by the authors of the Proposed Amendments to the Federal Rules of Civil Procedure, Rule 26(b) (4) (A), and (B), 43 F.R.D. 211, at 225, 226, 233-235 (1967); United States v. 23.76 Acres of Land, etc., 32 F.R.D. 593, 597 (D.Md.1963); United States v. Nysco Laboratories, Inc., 26 F.R.D. 159, 162 (E.D.N.Y. 1960); Franks v. National Dairy Products Corp., 41 F.R.D. 234 (W.D.Tex. 1966). The Proposed Rules became effective July 1, 1970. 48 F.R.D. 459, 462, 503-505 (1970).

Proposed Rule 26(b) (4) (A), adopted as Rule 26(b) (4) (B), limited discovery of the opinions of an expert employed for preparation of a case for trial, but not employed to testify at trial, to cases of "exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." 48 F.R.D. at 462.

■ The court concluded that defendant had made no showing of such "exceptional circumstances." At all times before trial defendant had complete control of the DK–8 wrecker crane. In fact, defendant had access to the DK–8 wrecker crane at a time when the repair records existed, a factor which certainly would have helped any expert determine the condition of this machine at the time of the accident. Also, until the pretrial defendant had kept control of the brake lining which had been removed from the wrecker crane. Furthermore, defendant had twenty of its own employees and two employees from Industrial Brownhoist present when the

---

20. Defendant's general trial counsel was an attorney of record in Leach.

plaintiff's experts examined the DK–8 wrecker crane. Later, defendant was provided with a copy of each picture which plaintiff's experts took of this crane. Finally, defendant with its vast financial resources, had full access to experts not only from its own employees, but from Industrial Brownhoist and from the educational community.

Proposed Rule 26(b) (4) (B), adopted as Rule 26(b) (4) (A), permits discovery of the opinions of experts who will testify at trial. The Advisory Committee Notes clearly point out that this new rule adopts a position that attempts to balance two important policy considerations. First, the courts have realized the need for more extensive discovery in order to promote more effective cross-examination and rebuttal. 43 F.R.D. at 234, 235, 48 F.R.D. at 503, 504. On the other hand, the courts are interested in preventing one party from having to prepare his adversary's case.

"Past judicial restrictions on discovery of an adversary's expert, particularly as to his opinions, reflect the fear that one side will benefit unduly from the other's better preparation. The procedure established in subsection (b) (4) (A) holds the risk to a minimum. *Discovery is limited to trial witnesses, and may be obtained only at a time when the parties know who their expert witnesses will be.* A party must as a practical matter prepare his own case in advance of that time, for he can hardly hope to build his case out of his opponent's experts." (Emphasis supplied.) 43 F.R.D. at 234; 48 F.R.D. at 504.

The defendant had not yet hired a mechanical engineering expert. In fact, the defendant made it clear that they would not until they had received the conclusions of the plaintiff's mechanical engineering experts. (October 16, 1969 Pretrial Transcript, p. 13.)

Therefore, the court at this time had no alternative but to deny the defendant's request for discovery of the opinions of plaintiff's mechanical engineering experts. It should be noted that denial of defendant's request to depose concerning "defects in design" carried no prejudice to the railroad. At no point did plaintiff claim that the DK–8 was defectively designed, and no testimony to this effect was offered.

On March 10, 1970, the second day of the trial, plaintiff called Mr. Herman Boruta, an employee of the defendant, who had not been listed at the pretrial conference. The defendant was aware of this and had stated on March 9, 1970, at an in camera hearing, that "I'll object to this production as part of the plaintiff's case."

██ However, when Boruta was called to testify, the defendant failed to raise any objection. This failure constituted a waiver of the right to object. Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1911); Kimmerle v. Farr, 189 F. 295 (6th Cir. 1911); J. Wigmore, Evidence § 18.

This particular situation provides a clear example of the reason for the long established rule requiring that objections be made timely and in such a manner as to enable the court to avoid error. Because no objection was made by the defendant when Mr. Boruta was called to testify, the court was simply not aware that he was not listed on one of the three lists of witnesses which contained over a hundred and twenty names.

Furthermore, the previous day's short in camera discussion between counsel concerning a "former crew member by the name of Urban Barru," had not provided the court with an adequate basis to have later determined, sua sponte, that Herman Boruta was not listed pursuant to the pretrial order.

On the other hand, if an objection had been timely made, the court and the plaintiff would have been provided with an opportunity to avoid any prejudice.

First, it is possible that the plaintiff would not have pressed this issue, for this witness' brief testimony added little to the plaintiff's case. Furthermore, an

objection by the defendant might well have been sustained by the court. Though it is clear that the defendant was not prejudiced by this witness' testimony, the plaintiff had made no showing to the court of a basis for modifying the pretrial order.

Also, on March 10, 1970, the plaintiff called a Mr. Clifford Reed to testify. On March 9, plaintiff's attorney had notified the court and the defendant that they wanted to call Mr. Reed as a witness.

The plaintiff's attorney explained the reason that he was late in identifying this witness:

"MR. BRANSDORFER: Your Honor, there is one matter that I would like to bring before the Court now, and it arises from the last topic you just mentioned.

*As the Court may recall, the records that related to the repair of the wrecker crane were allegedly stolen at some point after Mr. Kozar's death and prior to discovery. I don't know if the Court recalls—*

"THE COURT: Yes, I do.

"MR. BRANSDORFER: *We have had considerable problems of investigation in trying to pin down the specific things that were done.*

Sunday, yesterday, we were able to locate and talk by telephone with a former machinist who did some of the work following Mr. Kozar's death. His name is Clifford Reed. He is still in the city with General Motors Diesel. He is not subpoenaed as yet, but we hope to subpoena him, if the Court will permit us, even though we were not able to list him earlier as a witness." (Tr. p. 41.) (Emphasis supplied.)

Mr. Reed had been employed by the defendant until six months before trial and his testimony would be largely concerned with the period he worked for the defendant. If the defendant had wanted to depose Mr. Reed before he testified, this would have been possible on the evening of the ninth, or over the noon hour on the tenth, without disrupting either the course of the trial or this court's calendar. Also, Virgil Bosch, Mr. Reed's supervisor, was available to the defendant if Mr. Reed's testimony needed rebuttal. Finally, this court found it difficult to understand how the defendant would be prejudiced, since it too was aware that Mr. Reed had "knowledge of relevant facts," and yet had also failed to list him pursuant to the court's pretrial order, which it was duty bound to do under the order. It likewise had a duty to list Herman Boruta for the same reason.

Furthermore, the plaintiff had initially made a strong case for being granted a relaxation of the court's pretrial orders. The repair records for the wrecker crane were allegedly stolen at some point after Mr. Kozar's death and before discovery, even though these records had been under the complete control of the defendant's officers, agents and employees throughout this period. Because of this, the plaintiff had a difficult time "trying to pin down the specific things that were done" to the wrecker crane. Not until the day before the trial started had the plaintiff's attorneys located Mr. Reed, a "former machinist who did some of the work following Mr. Kozar's death."

Accordingly, the court concluded that "[I]f this is a later discovered situation, you certainly may [call this witness]."

The defendant did not object to the plaintiff's request to call Mr. Reed on either the 9th, or at the time he was put on the stand. The defendant also failed to object to the court's tentative ruling. Furthermore, the defendant failed to offer any evidence that would show that it would be prejudiced by the plaintiff's failure to identify Mr. Reed as a witness at the pretrial conference, or that this was not the "later discovered situation" described to the court.

This failure to object to this witness' testimony and the failure to point out to the court other factors that might well have changed this court's tentative rul-

ing, constituted a waiver of the defendant's right to challenge the testimony of this witness.

Following the six-day continuance for the death of defendant's local counsel, the defendant requested that it be granted the opportunity to call Mr. Lee. This was the defendant's first indication to the court or to the plaintiff that it wished to call a mechanical engineering expert. The plaintiff objected to this request on the grounds that Mr. Lee was not listed in any of the lists of witnesses submitted. The plaintiff's objection was sustained.

The defendant admitted that Mr. Lee had not been listed at the pretrial conference. Further, it also admitted that the plaintiff could not have been aware of Mr. Lee until that moment, for in fact the defendant's attorneys did not know of Mr. Lee until the night before.

To compensate for this surprise, the defendant suggested that the plaintiff depose Mr. Lee that evening, March 19, before he testified the next day. This procedure, however, would not have adequately eliminated prejudice to the plaintiff.

Mr. Lee was a mechanical engineering expert, called to testify about highly technical problems. The plaintiff's attorneys were not mechanical engineering experts. Accordingly, in order for the plaintiff's attorneys to understand Mr. Lee's deposition, these attorneys would have had to take Mr. Lee's deposition to their expert, let that expert digest this material, and then have their expert explain to them the weaknesses and strengths of Mr. Lee's testimony. Only after these efforts were completed would the plaintiff's attorneys have been properly prepared to proceed. Guaranteeing the plaintiff at this late date any less preparation would have been the cause of manifest injustice. Since this process could not have been completed that night, Mr. Lee was not permitted to testify.

Apart from any prejudice to the plaintiff, the defendant failed to show this court any reason why the pretrial order should be modified.

First, the defendant was aware that the plaintiff intended to have an expert testify as to the condition of the DK–8 wrecker crane and the small line brake system. The plaintiff's two experts examined the DK–8 wrecker in April 1969, almost one year before trial. The defendant's employees were present when this examination was made. The defendant was also given the names of these experts and told that they taught mechanical engineering at Michigan State University. If the defendant felt that its employees or those of Brownhoist were not similarly qualified, the defendant with all its resources could easily have found an expert of equal competence.[21]

The defendant, however, claims that a statement by its counsel, made during the hearing on the motion for discovery of the opinions of plaintiff's expert, indicates the reason that the defendant was unable to have selected an expert witness at any time prior to March 18, 1970.

"THE COURT: Who do you intend to call as an expert in this case?"

"DEFENDANT'S COUNSEL: I have no idea until I know—have some idea at least what the testimony might be." (P. 13.)

As previously stated, the court ruled that Proposed Amendments to Rule 26 (b) adopted as Rule 26(b) (4), would be the basis for the court's denial of the defendant's request to depose the plaintiff's experts. The court did not want the plaintiff to have to do the defendant's trial preparation. Permitting the defendant to wait until the plaintiff's

21. Listings of mechanical engineers are readily available. See, for example, ASME Membership List, American Society of Mechanical Engineers, July 1969, and Engineering and Technology Degrees, 1968–69, Engineering Manpower Commission of Engineers Joint Council. The former publication lists 1645 members of ASME in Michigan and 51,449 in the United States.

expert testifies at trial before the defendant selects its expert would in effect completely circumvent this ruling. Certainly this should not be permitted without a showing of exceptional circumstances.

It is also clear that this remark by defendant's counsel does not form a proper reason for modifying the pretrial order. The defendant had the resources to retain a mechanical engineering expert long before the last days of the trial.

Furthermore, the court can only assume that the defendant was always aware that such expertise might be needed. If the defendant had retained a mechanical engineering expert at an earlier date, both parties would have been permitted to discover the opinions of their adversary's expert. Cross-examination and rebuttal would have been more succinct and enlightened. Instead, this requested modification, if it had been permitted, would either have further delayed the trial or have required the plaintiff to proceed unprepared. Both results run counter to the mandate of Rule 1 and Rule 16.[22]

The defendant also claims that the death of defendant's local trial counsel is a sufficient reason for permitting Mr. Lee to testify. The defendant's contention is that this tragic event permits its general trial and co-counsel to ignore the pretrial order. Defendant's general trial counsel here urges the same lack of familiarity with the issues and proper preparation that he advanced when seeking a further continuance of this trial.

 It is clear that a litigant is bound by the representations of its counsel to the extent that those representations are within the scope of that counsel's authority. Since an attorney's authority extends to decisions relating to the preparation of a case for trial, this defendant was bound by the decision of its local counsel not to provide for a mechanical engineering expert. Therefore, this court would not permit modification of the pretrial order simply because the defendant's general trial and co-counsel had to continue without defendant's local trial counsel.

Finally, the attorneys who completed the trial were not new to the case. As stated in the previous section of this opinion, Mr. Straub is the Chesapeake and Ohio's general trial attorney for the State of Michigan. He signed the answer in this case and followed its progress through the pretrial stages. He was the only attorney with authority to negotiate a settlement. He participated in the entire trial, and made the final arguments to the jury on the liability issue. The defendant's other associate local counsel was also fully familiar with this case. He had participated in some of the pretrial conferences and had helped with research on the legal issues.

In these circumstances, it is likely that these attorneys helped make or fully endorsed the decision not to retain a mechanical engineering expert.

Therefore, the defendant's motion for new trial, based upon the court's refusal to modify the pretrial order, is denied.

*(d) Defendant's motion for mistrial.*

Defendant railroad made a motion for mistrial on the day this case went to the jury, March 23, 1970.

On March 19 and 20, articles dealing with a previous suit tried before this court appeared in the Detroit News and the Grand Rapids Press. These articles contained references to and quotations from the court's opinion in that case.

---

**22.** Even if this statement somehow permitted the defendant to ignore the pretrial order, the defendant, by the mandate of this very statement, should have chosen a mechanical engineering expert on March 10th or March 11th, at the time Professor Hinkle testified, and not have waited until March 18th. This court can only assume that the decision not to list a mechanical engineering expert on March 10th or 11th was fully endorsed by the defendant's general trial counsel.

Defendant claimed in its mistrial motion that the articles prejudiced the jury and thus precluded a fair trial in the instant case. It also urged that they indicated such bias in the trial court as to prevent him sitting as an impartial judge in litigation between a widow and a corporation.

The court denied the motion for a mistrial and instructed the jury as follows:

"You are also instructed to disregard anything you may have read or seen which relates to this type of action, to this type of injury, to this defendant, or to any previous case which this court may have ruled upon which may have been discussed in any newspaper article. You are to strike that entirely from your mind and concentrate only upon the law and the facts in this case. Any such information would have no bearing on the matter presently before you, and you should apply only the facts you gain from the evidence in open court as I have given it, and the law as I have given it to you in the resolution of this case.

"To allow outside influences to creep into your deliberations in this respect would violate your oath as jurors. And I know you will do just exactly what I say, because you have evidenced a high quality of attention and concern for the law and the facts as they come in, and the law as I give it to you."

Defendant now claims that the court's denial of its mistrial motion was error, adding that "the court's admonition to the jury to disregard any such publicity could only perpetuate and highlight the matter in the jury's mind."

The integrity of the fact finding process is, of course, of great concern to this court. Any allegation that the findings of a jury have been or will be prejudiced by publicity or similar matter extraneous to the trial process must be examined with great care, and all necessary steps should be taken to prevent such a result. Having carefully considered this problem in the instant case,

the court firmly believes that the above instruction was entirely adequate to protect against any potentially prejudicial effects of the publicity in question.

The articles involved did not relate to this case or to factual circumstances similar to it. The partial quotations from the court's previous opinion were limited to entirely different facts in a completely different lawsuit. The parties have nothing in common. The only common factors between Thayer and Kozar is that both involved plaintiff widows and defendant corporations. In light of the very limited points of similarity between the subject matter of the articles and the present case, it is difficult to see how remarks made in the former could have any real impact on the verdict in the latter.

However, even if the potential for prejudice is slight, the court should take all necessary steps to eliminate such a possibility. In this case the normal instructions with respect to publicity were expanded and particularlized in light of the defendant's express concern.

The railroad claims that no jury instructions could insulate it from the effect of the news articles. While such a claim may have merit where the publicity is extensive, relates to the very case being tried, and contains particularly harmful statements, Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966), this is not such a situation. It is safe to assume, in light of the low potential for prejudice resulting from these articles, that the jury will do its duty and faithfully follow the instructions of the court.

Defendant also claims that the articles reflect such bias where widows are litigating against corporations as to preclude this court's ability to conduct a fair trial.

A reading of the articles in question, and more importantly, the Thayer opinion, conveys no such bias. What they do reflect is a deep concern that access to justice be truly equal and that courts

must be vigilant to insure that economic disparity does not impair the quality of justice which is the ultimate end of our judicial process. To articulate such concerns cannot be judicial heresy. To apply them cannot lead to judicial disqualification. Defendant in essence is claiming that a judge who is sensitive to this problem is not fit to sit in a case where the problem might arise. To state the position is enough to suggest the appropriate response.

In addition, it is surprising that, in light of the extensive industry publicity currently before the public, this railroad can, with apparent equanimity, assert that the two articles in question could prejudice its interests before this jury.

The court takes judicial notice [23] of the fact that during this trial (several times daily) the railroad industry, particularly through television and radio, sought to bring the virtues of the American railroads to the attention of every citizen. This intense public relations campaign featured one of our astronauts and echoed the theme: "who needs railroads —you do, we all do." This message undoubtedly reached some, if not all, of the jurors in this case.

The court is not criticizing the industry's advertising effort. That is their prerogative, and may indeed be commendable when viewed in terms of other values. What is interesting, however, is that while waging an obviously partisan publicity campaign of its own, an industry member can seriously argue that a single newspaper article, not even concerned with railroads, could bias the jury's perception of this action. Even assuming a substantial ability on the part of the public to weigh the credibility of hard news as opposed to advertising, defendant's position is, in logic and fairness, simply incredulous.

(e) *Abuse of corporate power and access to FELA.*

This portion of the opinion does not deal directly with any ruling involved in this case. However, it does concern a matter of extreme importance for the effectiveness of the Federal Employers' Liability Act in general and the rights of individual plaintiffs in particular. For this reason the following remarks are viewed as being in aid of this court's present and potential Federal Employers' Liability Act jurisdiction, and therefore entirely proper for insertion into this opinion.

It is rare that the court feels it necessary to comment on events outside the scope of matters in litigation. The following facts reveal such a compelling situation.

On March 12, following the jury verdict on the liability issue, the court conducted an in camera conference to discuss the proofs of the damage aspect of the case. Inquiry was made as to settlement possibilities in light of the finding of liability. Defendant's general trial counsel replied that nothing had changed to alter his position because he had "fully expected them to find the railroad liable." Plaintiff's attorneys expressed surprise at counsel's statement that he knew from the beginning that this was a liability case. They related conversations with Chesapeake and Ohio's chief claim agent, a Mr. Butler from the railroad's home office in Baltimore, Maryland, wherein the railroad took the position that there was absolutely no basis for liability. This position apparently continued unaltered after suit was filed and throughout the discovery process.

Defendant's general trial counsel responded that he and defendant's local trial counsel had no connection with the Chesapeake and Ohio's Claims Department, and no knowledge of what its per-

23. Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 2–01 and accompanying comments. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69

(1960). Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 525, 89 S.Ct. 733, 746, 21 L.Ed.2d 731, 748 (1969).

sonnel had done or said. When the court expressed concern that negotiations be conducted in good faith, he replied that the railroad had eventually made offers based on an evaluation of recoverable damages. Defendant's general trial counsel then added that "98 per cent of our employee cases are settled without any litigation" and "without attorneys," and that "[w]e just happen to be involved in one of them we haven't been able to resolve. It is as simple as that."

Plaintiff then requested that Mrs. Kozar be allowed to put some facts on the record. The plaintiff was brought into chambers and the following dialogue occurred:

"MR. STRAUB: Seriously, Steve, what difference does that make what somebody told Mrs. Kozar a couple of years—

"THE COURT: It is the C & O Railroad speaking to Mrs. Kozar. Let her put it on the record.

"MR. BRANSDORFER: What she was told?

"THE COURT: Yes. In chambers.

"MR. BRANSDORFER: I think you'd be interested to hear this.

"MR. STRAUB: Maybe.

"MR. BRANSDORFER: Somebody told her that she should get rid of her lawyers.

"MR. STRAUB: What has that to do with our settlement negotiations?

"MR. BRANSDORFER: You are making certain statements, Mr. Straub, that I don't really believe fully reflects what is going on. And I don't think it is right. She really doesn't know what to do. She really doesn't. And why should somebody that has employed her husband for 35 years tell her that?

"MR. STRAUB. What has that to do with this lawsuit, what somebody told her? Does it have any relevancy to what we are doing here?

"MR. BRANSDORFER: I think it does. That goes to why you say it

settles all these things. All I know is what I have been told in this case.

Mrs. Kozar, I don't know if you met all these gentlemen. You have met the court.

"MRS. KOZAR: Yes.

"MR. BRANSDORFER: Mr. Strawhecker, Mr. Straub, and Mr. Larink, the Deputy Clerk. Have a seat.

"Mrs. Kozar, we have just been discussing factors relating to discussions that you had with various claims representatives of the C & O before the lawsuit was started, and it was shortly after you had talked with Mr. Engbers and myself.

"MRS. KOZAR: Yes.

"MR. BRANSDORFER: And I am not going to tell the Court now, so they can can get it from you without my suggesting this. Would you tell the judge and these gentlemen what you were told might happen—use your own words—in regards to starting a lawsuit?

"MRS. KOZAR: Well, I was told by Mr. Ten Elshof that if I didn't accept what they offered me, that I would lose everything.

"MR. BRANSDORFER: Do you remember when he told you that?

"MRS. KOZAR: I really don't recall, but it was maybe a few months after the funeral.

"THE COURT: A few months what?

"MRS. KOZAR: After the funeral.

"THE COURT: After the funeral?

"MRS. KOZAR: Uh-huh. Like I say, I—

"MR. BRANSDORFER: Do you recall what was said after the C & O representatives were informed that you had hired a lawyer?

"MRS. KOZAR: Well, they were really—I don't know the word. They didn't like it, really. And, oh, dear, I forgot what they said to me, but— Oh, dear, I just—I can't remember.

"THE COURT: Who was it?

"MRS. KOZAR: It was Mr. Butler and Mr. Ten Elshof. And—

"MR. BRANSDORFER: Do you remember—What is your best recollection when you talked with them and they knew that you had a lawyer? Just take your time.

"MRS. KOZAR: I just can't think of the word that he said to me. Oh, I wish I could recall it.

"MR. BRANSDORFER: Did he talk to you about keeping or not keeping the lawyers?

"MRS. KOZAR: Well, Mr. Ten Elshof called my son-in-law in Detroit and he wanted my son-in-law to call me and say that I should not retain an attorney. And we were really shocked about that.

"MR. ENGBERS: That was after we were retained; is that right?

"MRS. KOZAR: Yes. I wish I could recall what they said to me. Oh, dear. I just can't.

"MR. BRANSDORFER: When was the pass, based on what you can recall, when was your pass removed, do you remember? When did they tell you that you no longer had a lifetime pass on the railroad?

"MRS. KOZAR: Oh, that was shortly after I retained attorneys. And they wanted the pass because of that, because I was suing the railroad.

"MR. STRAUB: I didn't hear you. Sorry.

"THE COURT: 'They wanted the pass because I was suing the railroad.'

Anything else?

Thank you very much.

"MR. STRAUB: May I ask a question?

"THE COURT: Yes, you may.

"MR. STRAUB: Mrs. Kozar, have you been advised the railroad has offered you $75,000—

"MRS. KOZAR: No.

"MR. STRAUB: —in settlement of this lawsuit?

"MRS. KOZAR: Pardon me?

"MR. STRAUB: In settlement of this lawsuit?

"MR. BRANSDORFER: During this lawsuit, do you remember when we discussed—

"MRS. KOZAR: Oh, yes.

"MR. STRAUB: Did you refuse to accept it?

"MRS. KOZAR: Yes.

"MR. BRANSDORFER: Do you remember what it was the first time?

"MR. BRANSDORFER: Yes, if you—

"MRS. KOZAR: Ummm, $36,000 was the first time.

"MR. ENGERS: When was that offer made, do you recall?

"MRS. KOZAR: Right after the funeral. And then not until after I retained the attorneys, and this was at the trial—

"THE COURT: Pre-trial?

"MR. BRANSDORFER: Pre-trial.

"MRS. KOZAR: Fifty thousand.

"MR. BRANSDORFER: Do you remember—

"THE COURT: Yes, she was present at that pretrial.

"MRS. KOZAR: Yes. And I think it was just recently, probably last week, $75,000.

"THE COURT: Anything else? Thank you very much.

"MR. STRAWHECKER: I would like to say this, at the pre-trial where I offered $50,000, there was no response from plaintiff's counsel.

"MR. BRANSDORFER: I think the record speaks for itself, Your Honor.

"THE COURT: Yes, it does.

(MRS. KOZAR LEAVES CHAMBERS.)"

John Kozar was, according to the testimony, one of the Chesapeake and Ohio's most valuable employees. He was killed while serving, to the extent of his ability, the best interests of the rail-

road. The above indicates a strong probability that, from the moment of his death, his employer adopted some rather primitive means in an attempt to defeat the just claims of his widow under a statute specifically designed for his own and his family's protection.

It is not the prerogative of the court at this time to pass judgment upon the settlement tactics used by the defendant railroad in this case. But it cannot ignore the implications of the undisputed facts revealed in the above record. The drafters of the Federal Employers' Liability Act legislation intended that the Act provide an *effective* and readily *available* remedy for negligence-related injuries in the railroad industry. They intended that federal courts should be the forum in which rights under the Act should be determined. They were well aware of the abuses inherent in the prior pattern of railroad injury litigation. If threats, coercion, economic pressure or other devices effectively curtail or deter an injured employee's resort to Federal Employers' Liability Act relief, or result in unjust settlements for injured employees and beneficiaries, then the purpose of Congress is thwarted and the individual is deprived of both his remedy and his forum, and injustice prevails. To the extent that railroads knowingly employ or condone such measures, they are in open defiance of both Congress and the courts.

The problems involved in employee suits against their railroad employers has received concerned attention since the Federal Employers' Liability Act became law. Students of railroad injury litigation have noted the presence of many factors that inhibit court adjudication of Federal Employers' Liability Act rights. Jerome Pollack, writing in Workmens Compensation for Railroad Work Injuries and Diseases, 36 Cornell Law Quarterly, 236 at 240, states:

"Most employees are understandably apprehensive about "starting trouble" with the railroad. It is hardly to be expected that they can initiate court proceedings against their employer without the fear that by so doing they will jeopardize their chances for further employment. Employees are theoretically protected against the employer's retaliation by the section of the Act which *voids any device by which the carrier may seek to exempt himself from liability*. Moreover, under collective bargaining agreements an employee may not be dismissed except for good cause. Then, too, employees discharged for filing suit against the employer are, on appeal, generally reinstated with back pay. *Nevertheless, according to the accounts of injured employees, the belief is widespread that to bring a claim to court is to invite dismissal. This threat is used frequently by claim agents in dissuading employees from filing suit or even engaging an attorney.*

"Even without such threats, a satisfactory settlement may well be considered secondary in importance to a chance for future employment. If the employee is only partially disabled, he may want the railroad to offer him a "lighter" job which he can perform with his reduced capacity for work. He naturally believes that a "cooperative attitude" will improve his chances for such a job. If he is permanently disqualified from employment he, or his widow in a fatal injury, may still hope to obtain a job for his son or another family member."

This concern was reported to Congress in a study, completed in 1947, by the Railroad Retirement Board.[24]

---

24. Railroad Retirement Board, Work Injuries in The Railroad Industry, 1938–1940 (2 Vols., 1947):
 "There are several factors inhibiting court prosecution of claims. *In the first place, the employee believes, wheth-* er correctly or not, that suing the company is a sure way to dismissal. True the employee's privilege to enforce his rights by instituting suit is presumably protected by section 5 of the Federal act—a provision duplicated in some

The Act itself contains one attempt to guard against potential abuses:

"Any contract, rule, regulation, *or device whatsoever,* the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter,

State laws—which voids 'any contract, rule, regulation or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt himself from any liability created by this act.' Moreover, under agreements between labor organizations and employers, which cover the great majority of railroad employees, no employee may be dismissed without good cause, such as violation of rules, misconduct, and the like. *Nevertheless the belief that going to court will jeopardize job tenure is widespread and is, according to reports on schedule 3, used frequently by claim agents in dissuading employees from filing suit or even engaging attorneys.* In some cases indeed the claim agents go much further with implied threats that if suit is filed the claimant would never be able to work for any big company again or would receive references so unfavorable as to amount to blacklisting.

"Because of the safeguards that apparently surround job tenure, it is difficult to obtain indisputable statistical or other evidence bearing on the relationship between suit filing and loss of job. However an analysis from this standpoint of the reports submitted to the study should perhaps provide a test. Such analysis must necessarily be confined to types of disability from which a return to regular employment is possible, i. e., permanent partial and temporary total disabilities. Furthermore, it is obviously necessary to exclude even in these classes of disability, individuals who, in their own opinion or that of the company physician, were disqualified from returning to their former jobs; individuals who retired on annuities; and those who were dismissed for specific reasons, such as violation of rules, drunkenness, misconduct, etc. In order to make absolutely sure, occupations like track laborer, trucker, or station and platform laborer were also excluded because for many persons in these occupations it is not customary to maintain a continuous employment relationship. The analysis is confined to cases handled under the liability laws and

shall to that extent be void:" 45 U.S. C.A. § 55.

This section declares a public policy to void releases or *other exculpatory devices procured under circumstances that indicate an attempt to avoid Federal Employers' Liability Act liabili-*

common law. Information was used from both schedule 2 submitted by employers and schedule 3 based on interviews with employees, wherever reports were available. The figures compiled in this analysis are as follows:

| Type of injury and method of representation | Returned to former employer | Did not return to former employer |
|---|---|---|
| Permanent partial | | |
| Non-attorney cases | 849 | 20 |
| Attorney represenation, no suit | 31 | 6 |
| Suit filed | 25 | 20 |
| Temporary total | | |
| Non-attorney cases | 11,811 | 177 |
| Attorney representation, no suit | 72 | 13 |
| Suit filed | 17 | 16 |

While only a negligible proportion of those who did not engage an attorney failed to resume work with their former employers, the employment relationship was severed in almost half of the cases in which suit was filed. *Even the injection of an attorney into the negotiations, without initiation of court action, appears to raise the proportion of* "*no return*" cases. In none of these cases is there an admission by the employer of dismissal for filing suit, although for some of them statements like "did not return—filed suit" or "resigned and filed suit" appear on schedule 2 as an explanation for failure to return. On the other hand charges by employees of dismissal or forced resignation are made quite plainly in most of these cases. *In a number of cases resignation is one of the conditions of settlement, according to the employees.* The contrast in the proportion of "no return" in suit-filed and other cases seems to support the contention, if not of outright involuntary separation, at least of the imminence of dismissal should the employee attempt to come back. There would appear to be no other reason for failure to retain the substantial advantages of continuing seniority rights, particularly since the settlement payments were not in any sense munificent or providing a nest-egg for life" (Emphasis supplied.)

*ty.* Had the railroad's efforts in this case produced an agreement or release by Mrs. Kozar, the above facts argue strongly against its survival under Section 55.[25]

The problem reflected in these brief statements and in the record above is not unfamiliar to the court. However, this case produced facts which made possible intimidation of potential parties litigant an issue of direct and immediate concern. Such coercion, whenever and wherever it exists, is utterly abhorrent to our system of justice. It is an attempt to ignore the courts and to settle disputes in the arena of private affairs and solely upon the basis of private power. The law is avoided as being incompatible with private interests. This is nothing more than a return to or continuation of the rule of the mighty, and will inevitably involve the sacrifice of the rights of the weak. Those who thus treat the law as a second-class remedy

had best be wary when entering a federal court, whose primary duty is to " * * * establish 'Justice' * * * "[26] and " * * * to secure the just, speedy and inexpensive determination of every action." [27]

To the extent coercive tactics are used by railroads against their injured employees to discourage resort to Federal Employers' Liability Act litigation, the result is an impermissible chill on rights created by Congress, and which as a matter of public policy and natural law inheres in each employee as a human being. Any chilling effect can be expected to extend not only to prospective Federal Employers' Liability Act plaintiffs, but to all employees and their families. It could be expected to prevent unfavorable testimony as well as the filing of lawsuits. This result is intolerable.

Any such situation that comes before this court will receive the closest atten-

---

25. Melvin L. Griffith, The Vindication of a National Public Policy Under the Federal Employers' Liability Act, 18 Law and Contemporary Problems, 160 at 169 (1953); Duncan v. Thompson, 315 U.S. 1, 6, 62 S.Ct. 422, 86 L.Ed. 575 (1942). *Counsel's repeated plea that he had no knowledge or control over the activities of the Chesapeake and Ohio claim agents is immaterial to the issue of sanctions against coercive action.* The specific vehicle through which a corporation engages in such activity is of no significance. The familiar occurrence whereby one set of . company officers disavows any connection with officials in other areas cannot be used to avoid a corporation's overall responsibility for the conduct of all its employees and agents.

The Supreme Court of the United States conferred citizenship and personality upon the corporation—an artificial being existing in contemplation of law—making it equal before the law with a human being. When an individual comes into court he brings all of his obligations and duties, all his rights, privileges and immunities. These attributes inhere in the same person. To establish true equality before the law, a corporation must have the same responsibilities and obligations as an entity as does a human being.

One manifestation of the problems faced by an individual litigating against a multi-

faceted corporate structure was revealed through defendant's witness Richard VanderMolen. Testimony indicated that Chesapeake and Ohio claim agents took statements from all employees present when John Kozar was killed. No statement made by Mr. VanderMolen was produced. The defendant also, in sworn answer to interrogatories, listed the names of employees present at the accident site. Mr. VanderMolen's name was not on the list. It was not until the last days of the trial that defendant revealed this important witness' presence on the scene and offered his testimony. Since his name was listed at pretrial as a possible general witness, he was permitted to testify and related events surrounding the accident, including a conversation with Mr. Kozar. Plaintiff was entitled to this information at the pretrial stage. The fact that it was not so provided casts suspicion on the credibility of his testimony.

Of more significance, though, it evidences the difficulty an individual faces when confronting in litigation the complexities of a large corporation.

26. Preamble of the United States Constitution.

27. Rule 1 of the Federal Rules of Civil Procedure.

tion. Every remedial weapon, including contempt, will be available to insure uninhibited exercise of federal rights. To the extent allowed by law, other agencies of government will be advised and requested to take appropriate action. These practices, to the extent they exist and are detected, will not be allowed to continue.

## CONCLUSION

The court has been made aware that Federal Employers' Liability Act cases cannot be properly tried without an understanding of the purpose and policy behind the humanitarian legislation. It is also aware that, in the minds of some judges and commentators, trial court have historically been less than faithful to the full impact of Federal Employers' Liability Act principles. As stated by Mr. Justice Douglas, concurring in Wilkerson v. McCarthy, 336 U.S. 53, 68, 69 S.Ct. 413, 420–421, 93 L.Ed. 497 (1949):

"The Federal Employers' Liability Act was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations. Not all these costs were imposed, for the Act did not make the employer an insurer. The liability which it imposed was the liability for negligence. But judges had created numerous defenses—fellow-servant rule, assumption of risk, contributory negligence—so that the employer was often effectively insulated from liability even though it was responsible for maintenance of unsafe conditions of work. The purpose of the Act was to change that strict rule of liability, to lift from employees the 'prodigious burden' of personal injuries which that system had placed upon them, and to relieve men 'who by the exigencies and necessities of life are bound to labor' from the risks and hazards that could be avoided or lessened 'by the exercise of proper care on the part of the employer in providing safe and proper

machinery and equipment with which the employee does his work.'

"That purpose was not given a friendly reception in the courts. In the first place, a great maze of restrictive interpretations were engrafted on the Act, constructions that deprived the beneficiaries of many of the intended benefits of the legislation. See Seaboard Air Line [Ry.] v. Horton, 233 U.S. 492, 34 S.Ct. 635, 58 L.Ed. 1062; Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 48 S.Ct. 215, 72 L.Ed. 513; and the review of the cases in Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 62–67, 63 S.Ct. 444, 448–451, 87 L.Ed. 610, 143 A.L.R. 967. In the second place, doubtful questions of fact were taken from the jury and resolved by the courts in favor of the employer. This Court led the way in overturning jury verdicts rendered for employees. See Chicago, M. & St. P. R. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041; Missouri Pac. R. Co. v. Aeby, 275 U.S. 426, 48 S.Ct. 177, 72 L.Ed. 351; New York Central R. Co. v. Ambrose, 280 U.S. 486, 50 S.Ct. 198, 74 L.Ed. 562. *And so it was that a goodly portion of the relief which Congress had provided employees was withheld from them.*"

Following passage of the 1906 Act one of its authors, Edward A. Moseley, first Secretary of the Interstate Commerce Commission, became concerned about a forthcoming campaign against the Act by railroad lawyers. He requested and obtained the intervention of the Justice Department on behalf of the legislation. Moseley's remarks on this occasion are quoted and commented upon by Melvin L. Griffith in The Vindication of a National Public Policy Under the Federal Employers' Liability Act, 18 Law and Contemporary Problems 160, 171 (1953):

" 'I regard this action as one of the most important events in the interest of labor that has ever occurred. Were railway employees, who seek to obtain damages for injuries received, left to

their own resources there is no question that the benefits which this law seeks to confer upon them would be neutralized or entirely destroyed by the action of the courts.

" *'The railroad companies have the strongest array of legal talent in the country, and this talent will all be directed toward defeating the ends of any such law as this. No private individual can hope to cope with such power; it will be impossible for any railway employee, who invokes the aid of this law, to employ attorneys who can successfully meet the arguments of counsel for the railroad companies. But with the resources of the department of justice placed at his command, in order to protect the integrity of the law, the railway employee is placed on a plane of practical equality with the railway company, and he is thus insured a square deal.'*

\* \* \* \* \* \*

"If the above language of Mr. Moseley was prophecy, its indisputable truth has long since been established. That is not strange, for it is the language of a man who not only knew what was taking place, but could see into the future from the vantage point of thirty years of intimate experience with the problems of operative railroad men, with the attitude of the railroads toward their employees, and with the obtuseness or hostility of many of the courts where such problems were involved." (Emphasis supplied.)

Frankfurter and Landis, writing on the effectiveness of the Federal Employers' Liability Act in 46 Harv.L.Rev. 226, 229 (1932), upon reviewing the cases remarked:

"The deepest significance of these cases is the proof they furnish of the futility of the Act itself. When the process of interpretation and application after 25 years still yields unabated litigation and reveals an ap-parent growing inability on the part of the judges primarily trusted with its administration to know its meaning, surely the legislation has proven a failure."

The above quotations and other similar statements scattered throughout the Federal Employers' Liability Act jurisprudence have led the court to take particular interest in these cases and devote considerable time to extensive research in the area at large. These efforts have yielded one singularly important conclusion: the purpose and policy of Federal Employers' Liability Act legislation is to promote adequate recovery for negligently injured railroad workers and thereby promote safe operating conditions. This well documented policy of recovery is a factor which has an impact upon every aspect of Federal Employers' Liability Act litigation.[28] This consideration must be brought to bear on both legal and procedural problems. It is clearly the will of Congress that this should be done.

The court has applied this policy whenever appropriate during the course of this case.

There have been instances, such as with the pressures revealed to have been applied to Mrs. Kozar, where an apparent management policy of the Chesapeake and Ohio Railroad has been at odds with both the policy of Congress expressed through the Federal Employers' Liability Act and the broader public policy of the fair play which permeates all aspects of our common law:

"What is the meaning of "public policy"? A correct definition, at once concise and comprehensive, of the words "public policy," has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word "fraud" or the term "public welfare." In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, pub-

---

28. For a similar analysis in another area, see Moragne v. States Marine Lines, Inc., supra.

lic health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

"[1, 2] Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. *More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court."* Pittsburgh, C., C., & St. L. Ry. Co. v. Kinney, 95 Ohio St. 64, 68, 115 N.E. 505, 507 (1916), cited with approval in Hammonds v. Aetna Casualty & Surety Co., 243 F.Supp. 793 (N.D.Ohio, 1965.)

The court may use its discretion, in furtherance of the above public policy, to insure that basic unfairness is not injected or perpetuated in the course of litigation in this court.

All of the issues of fact drawn by the pleadings and evidence were properly submitted to the jury. The jury's findings on these issues are to be disturbed only in the most unusual circumstances. Applying the policy of Rogers v. Missouri Pacific R. Co., supra, in light of the numerous Supreme Court decisions declaring a special solicitude for Federal Employers' Liability Act plaintiff's Seventh Amendment rights,[29] the court concludes that this case presents no such situation:

"The kind of misconception evidenced in the opinion below, which fails to take into account the special features of this statutory negligence action that make it significantly different from the ordinary common-law negligence action, has required this Court to review a number of cases. In a relatively large percentage of the cases reviewed, the Court has found that lower courts have not given proper scope to this integral part of the congressional scheme. We reach the same conclusion in this case. The decisions of this Court after the 1939 amendments teach that the Congress vested the power of decision in these actions exclusively in the jury and all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury. Special and important reasons for the grant of certiorari in these cases are certainly present when lower federal and state courts persistently deprive litigants of their right to a jury determination." Rogers v. Missouri Pacific R. Co., supra [352 U.S. 511, 77 S.Ct. 450].

Accordingly, the court finds adequate evidence to support the jury findings and awards in this case, including the award of punitive damages.

For the reasons set forth in this opinion, defendant's motion for a new trial is denied in all respects.

---

29. See Rogers v. Missouri Pacific R. Co., supra, footnotes 17 and 24. The Supreme Court's concern in this area manifested itself primarily through reversal of lower court decisions which ignored the special function of the jury as the ultimate finder of fact in Federal Employers' Liability Act litigation.